Andre Stanley DEPUTY, Appellant,

v.

Stanley TAYLOR, Warden, Sussex
Correctional Institution,
Appellee.

No. 93–9003.

United States Court of Appeals,
Third Circuit.

Argued Aug. 18, 1993.

Decided March 3, 1994.

Kevin J. O'Connell (argued), Wilmington, DE, and Paula G. Caputo, Cooch & Taylor, Wilmington, DE, for appellant.

Fred S. Silverman,[1] Chief Deputy Atty. Gen., Thomas A. Stevens (argued), Deputy

---

1. Since oral argument, Fred S. Silverman has become a Judge of the Superior Court of Dela- ware and accordingly has withdrawn as counsel.

Atty. Gen., Dept. of Justice, Wilmington, DE, for appellee.

Present: GREENBERG, HUTCHINSON and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellant, Andre Stanley Deputy ("Deputy"), a death row inmate in a Delaware state prison, seeks to appeal an order of the United States District Court for the District of Delaware denying his petition for a writ of habeas corpus. The state court imposed the sentence after a jury convicted Deputy of two counts of intentional murder, two counts of felony murder, one count of first-degree robbery and one count of possession of a deadly weapon during the commission of a felony.[2] The same jury thereafter unanimously voted to impose the death penalty for four murder convictions. *See* Del.Code Ann. tit. 11, § 4209(d)(1) (1987) (amended 1988).[3] On direct appeal, the Delaware Supreme Court overturned the intentional murder convictions but affirmed the findings of guilt and the sentences on the two felony murders and the other counts. *Deputy v. State*, 500 A.2d 581 (Del.1985) (*"Deputy II "*), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987). Deputy unsuccessfully sought post-conviction relief in the Delaware courts. *See Deputy v. State*, 602 A.2d 1081 (Del.1991) (table) (*"Deputy III "*).

On October 3, 1991, Deputy filed his initial petition for a writ of habeas corpus under 28 U.S.C.A. § 2254 (West 1977). After the district court appointed counsel, it granted Dep-

uty's motion for leave to amend and Deputy filed an amended petition on February 26, 1992. Contemporaneously with the amended petition, Deputy filed motions seeking leave for discovery, authorization to hire a psychiatric expert at government expense and permission to expand the record.

The petition and motions were referred to a magistrate-judge. She issued a Report and Recommendation of denial on April 23, 1993. Deputy filed objections to the report, but on May 28, 1993, the district court dismissed the amended petition without prejudice as a mixed petition which contained both exhausted and unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509, 510–18, 102 S.Ct. 1198, 1199–1203, 71 L.Ed.2d 379 (1982). On July 30, 1993, the Delaware Superior Court dismissed all but one of Deputy's unexhausted claims as procedurally barred and denied his motion for a stay of execution. On August 13, 1993, it denied post-conviction relief on the last remaining unexhausted claim.

On August 11, 1993, before the superior court's post-conviction ruling on the remaining unexhausted claim, Deputy filed this habeas petition, renewed his prior motions, and expressly abandoned the claim still before the superior court. The district court denied Deputy's motions as well as his petition for habeas corpus relief. That order was the first federal decision on the merits of Deputy's claim that his death sentence was unconstitutionally imposed. In his petition, Deputy raised, in scattergun fashion, many arguments. The district court decided, without discussion, that many of them lacked merit

---

2. We briefly recite the facts of the murder. Co-defendant William Flamer's elderly aunt and uncle were brutally stabbed to death in their own home. Each received between 60–80 separate stab wounds. Each had been stabbed with two weapons, a bayonet-type knife and a smaller knife. Police found many items missing from the home in the possession of Deputy or Flamer. For a more detailed statement of the facts see *State v. Deputy*, 433 A.2d 1040 (Del.1981) (*"Deputy I "*), and *Deputy v. State*, 500 A.2d 581 (Del. 1985) (*"Deputy II "*), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987).

3. Delaware's capital sentencing statute reads, in pertinent part:
 (d) *Determination of sentence—*

(1) A sentence of death itself shall not be imposed unless the jury ... finds:
a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death shall be imposed.... A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.
Del.Code Ann. tit. 11, § 4209(d)(1).

but it did discuss many others in a lengthy opinion. The district court refused to issue a certificate of probable cause and declined to issue a stay of execution. *See Deputy v. Taylor,* Civ.A. No. 93–387, 1993 WL 643368 (D.Del. Aug. 17, 1993).

On August 17, 1993, Deputy filed with this Court a motion to stay his execution, then scheduled for August 19, along with an application for a certificate of probable cause. On August 18, 1993, the State filed a response opposing Deputy's motion for a stay and its own motion for summary affirmance of the district court order. We heard oral argument on these motions that same day. After recessing for conference, we entered an order from the bench staying execution pending further order of this Court. We concluded a stay was needed to give us an opportunity to review all of Deputy's contentions. In light of the extensive record before us we could not immediately resolve the threshold issue whether Deputy had made a "substantial showing of the denial of a federal right," *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) (quoting *Stewart v. Beto,* 454 F.2d 268, 270 n. 2 (5th Cir.1971), *cert. denied,* 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 126 (1972)), and was thus entitled to the issuance of a certificate of probable cause. In addition, this was our first opportunity to consider Deputy's claims on their merits, and we were aware that the Supreme Court had granted certiorari in a case presenting an issue similar to one Deputy had raised. We ordered the parties to file briefs by August 30, 1993, addressing, but

not limited to, the issues discussed in oral argument. We also requested submission of those portions of the state and district court records that the parties deemed material to their arguments.

Later, on August 25, 1993, we specifically asked the parties to address the effect of *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.), *cert. granted,* —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993), on Deputy's motion for a stay of execution and a certificate of probable cause. In *Middlebrooks,* the writer of the majority opinion for the Supreme Court of Tennessee concluded that the Eighth Amendment to the United States Constitution prohibits a sentencer in a felony murder prosecution from considering the fact that the murder was committed in the perpetration of a felony as an aggravating circumstance to impose the death penalty. *Id.* at 346.[4]

On September 29, 1993, after briefing, we ordered Deputy's case held c.a.v. pending the Supreme Court's decision in *Middlebrooks* and thereafter until further order of this Court. The Supreme Court heard oral argument in *Middlebrooks* on November 1, 1993, but on December 13, 1993, entered a brief order holding that certiorari had been improvidently granted.

Though Deputy makes many arguments before the district court and on the merits of this appeal in his written motion for a certificate of probable cause and at oral argument on it, he limits himself to the following:[5] (1)

---

**4.** Deputy had raised this issue in the district court.

**5.** Other than Deputy's ineffective assistance of counsel claims (at the trial, sentencing, and appellate phases), the district court concluded that all of Deputy's claims should be dismissed on one of six grounds. We summarize as follows:

(1) *Claims Barred by Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)*—
(a) the alleged violations of the Fourth and Fourteenth Amendments through the search of Flamer's residence and Deputy's investigatory detention and search (Dist.Ct. op. at 29–32)
(2) *Claims Precluded by the Presumption of Correctness Given to State Court Fact Findings under 28 U.S.C.A. § 2254(d)*—
(a) voluntariness of Deputy's first confession (Dist.Ct. op. at 34–35)

(b) admission of illegally obtained evidence as to the felony murder count (Dist.Ct. op. at 35–36)
(c) admission of certain exhibits at trial (Dist.Ct. op. at 37–39)
(d) challenges to the jury instructions in both the guilt and sentencing phases (Dist.Ct. op. at 39–43)
(3) *Claims Barred by Procedural Default Under Delaware Superior Court Criminal Rule 61(i)(3) and No Cause and Prejudice Was Shown*—
(a) contentions that jury had been exposed to publicity and persons morally opposed to death penalty were improperly excluded (Dist. Ct. op. at 48–51)
(b) allegedly prejudicial remarks of prosecution concerning Flamer's conviction, its calling Flamer as a witness only to have him plead the Fifth Amendment and allegedly improper comments by the state prosecution during summation including his alleged expression of person-

admission of evidence he says the state obtained in violation of the Fourth and Fourteenth Amendments; (2) his challenge to the jury's composition based on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) ineffective assistance of counsel at the sentencing phase; (4) the effect of the jury's consideration of evidence which the Delaware Supreme Court held was unconstitutionally seized on its finding that Deputy was guilty of felony murder and deserved the death penalty; (5) the jury's improper imposition of a death sentence on him on a theory of accomplice liability; (6) the trial court's action excusing for cause three jurors who had moral scruples against the death penalty; and (7) the jury's dual consideration of the robbery that culminated in the two murders as the basis for its finding that he was guilty of felony murder and as an aggravating circumstance justifying the death penalty. For the reasons that follow, we hold that Deputy has failed to make a substantial showing of a right to federal habeas relief.

Therefore, we will deny Deputy's application for a certificate of probable cause and

al opinion in closing (Dist.Ct. op. at 51–52, 56–59)

(c) the court's charge to the jury on accomplice liability, the burden of proof, reasonable doubt, voluntariness of Deputy's statements, voluntary act, lesser included offense, and failure to give separate instructions for each victim (Dist.Ct. op. at 53–56)

(4) *Claims Barred Because Based on Insufficient Facts*—

(a) invalidity of the grand jury's indictment because it excluded minorities (Dist.Ct. op. at 66–67)

(b) illegal search and seizure incident to an unlawful arrest and use of a coerced confession (Dist.Ct. op. at 67–68)

(c) use of improper exercise of peremptories under *Batson* (Dist.Ct. op. at 68–69)

(d) failure to sequester jury and witnesses (Dist. Ct. op. at 69–70)

(e) violation of Deputy's right to confront certain witnesses (Dist.Ct. op. at 70–71)

(f) insufficient evidence on a necessary element of felony murder (Dist.Ct. op. at 72–73)

(g) constitutional invalidity of Delaware's death penalty statute because it is arbitrary and capricious and has a disproportionate impact on poor and black (Dist.Ct. op. at 73–74)

(h) Deputy's failure to be given, as an indigent, funds to obtain better counsel, investigators, psychiatrists and other experts at the post-conviction stage (Dist.Ct. op. at 74–75)

(5) *Claims Which State No Basis for Relief*—

vacate the stay we imposed on August 18, 1993.

## I. *Fourth Amendment*

Deputy, pre-trial, appealed the superior court's refusal to suppress the victim's watch and wallet, as well as money the police seized from him after they interrogated him at the police station. The superior court agreed with Deputy and suppressed the items seized from Deputy's person during his investigatory detention. The Delaware Supreme Court reversed. *See State v. Deputy*, 433 A.2d 1040 (Del.1981) ("*Deputy I*"). Deputy alleges that the failure of the Delaware Supreme Court to accord retroactive effect to *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), *see Deputy I*, 433 A.2d at 1044, violated the right of due process guaranteed him by the Fourteenth Amendment to the Constitution. In *Dunaway*, the Supreme Court held that police violated Dunaway's Fourth Amendment rights when they detained him without probable cause to arrest and transported him to the police station for interrogation. *Duna-*

(a) Deputy was convicted and sentenced based solely on an accomplice liability theory in violation of *Enmund* (Dist.Ct. op. at 76–77)

(b) constitutional invalidity of using robbery as both the basis for the felony-murder conviction and as an aggravating circumstance to impose death (Dist.Ct. op. at 77–79)

(c) constitutional invalidity of admission of *Robinson* plea to an unrelated offense for the purpose of proving an aggravating circumstance where in the absence of showing that Deputy was informed before entering *Robinson* plea it could be so used (Dist.Ct. op. at 79–81)

(d) Delaware Supreme Court relied on evidence on in the record, relied on legal theories of guilt not set forth, and usurped role of jury as fact finder in upholding Deputy's convictions for robbery and felony murder (Dist.Ct. op. at 81–82)

(6) *Factually Inaccurate Claims*—

(a) challenges to the propriety of the psychiatric exams (Dist.Ct. op. at 82–83)

(b) denial of discovery by state (Dist.Ct. op. at 83).

Based on our independent review of the contentions of the parties, the record, and the case law, we are persuaded that the district court's reasoning is both accurate and persuasive. We will therefore further discuss only the seven issues stated above.

*way*, 442 U.S. at 216, 99 S.Ct. at 2258. New York had conceded, as Delaware does here, that it did not have probable cause for arrest. *Id.* at 207, 99 S.Ct. at 2253. The Supreme Court held that the "reasonable suspicion" which permits a limited stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1986), is not enough to allow the police to transport the person stopped to the police station and extract information through detention and interrogation. *Dunaway*, 442 U.S. at 212–15, 99 S.Ct. at 2256–58.

 The district court held that Deputy's *Dunaway* claim was barred by *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Dist.Ct. op. at 29–32. In *Stone*, the Supreme Court held a federal court should not grant a state prisoner habeas corpus relief because evidence obtained in an unconstitutional search or seizure was introduced at his trial if the state had already provided an "opportunity for full and fair litigation" of this Fourth Amendment claim. *Stone*, 428 U.S. at 494, 96 S.Ct. at 3052; *see also Townsend v. Sain*, 372 U.S. 293, 313–14, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963) (defining requirements of full and fair hearing). In *Cardwell v. Taylor*, 461 U.S. 571, 572–73, 103 S.Ct. 2015, 2016, 76 L.Ed.2d 333 (1983) (per curiam), the Supreme Court held on habeas review that *Stone* precluded the court of appeals from considering petitioner's argument that *Dunaway* required the exclusion of statements taken after he was detained without probable cause in violation of the Fourth Amendment. Even otherwise potentially meritorious Fourth Amendment claims are barred on habeas when the petitioner had a full and fair opportunity to litigate them. *See also Gilmore v. Marks*, 799 F.2d 51, 57 (3d Cir.1986) (rejecting argument that erroneous determination of habeas petitioner's Fourth Amendment claim overcomes *Stone* because that claim is really for a due process violation), *cert. denied*, 479 U.S. 1041, 107 S.Ct. 903, 93 L.Ed.2d 853 (1987). Here,

Deputy had a full and fair opportunity to litigate the *Dunaway* Fourth Amendment issue in the state courts. *See Deputy I*, 433 A.2d at 1044–45; *cf. Deputy II*, 500 A.2d at 581; *Deputy III*, 602 A.2d at 1081. Accordingly, we agree with the district court that *Stone* bars consideration of Deputy's Fourth Amendment *Dunaway* claim.

## II. *Batson*

Deputy is African–American. He was convicted by an all-white jury. He contends that his Sixth and Fourteenth Amendment rights were violated when the prosecutor intentionally exercised peremptory challenges to remove African–Americans from the jury. The district court decided the record before it did not present a sufficient factual basis to support Deputy's *Batson* claim. It also denied Deputy's request for further discovery on the *Batson* issue, stating:

> There is simply no evidence that could be discovered now that was not available during Petitioner's post-conviction claim for relief for which [the state court] held explicitly was unproven by the record. As such, the Court will not judicially endorse a practice whereby Petitioner can further delay these proceedings with a discovery request that is way past due and without even a hint of resulting in probative evidence.

Dist.Ct.Op. at 69 (citation omitted).

In order to consider the merits of Deputy's *Batson* claim, we will assume without deciding that *Batson* applies to this case.[6]

Even if *Batson* retroactively applies to Deputy's collateral attack on his conviction and sentence, the state says we should not reach the merits of Deputy's *Batson* claim because he never raised a question about the composition of the jury in the criminal case itself, even under the *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965),

---

6. *Batson* was not decided until April 30, 1986, after the Delaware Supreme Court affirmed Deputy's felony murder convictions and accompanying death sentences on direct appeal. *Batson* was decided before the United States Supreme Court denied Deputy's petition for certiorari in 1987. Later, the Supreme Court held that *Batson* applies to "all cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 1875, 93 L.Ed.2d 649 (1987). *Accord Linkletter v. Walker*, 381 U.S. 618, 622 n. 5, 85 S.Ct. 1731, 1733 n. 5, 14 L.Ed.2d 601 (1968). Finality does not occur until the time for filing a petition for certiorari has lapsed.

standard that was in effect before *Batson*. *Cf. Government of the V.I. v. Forte*, 865 F.2d 59, 63–64 (3d Cir.1989).[7] In *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam), the Supreme Court held that *Batson* would not be applied on collateral review of convictions. There, however, the direct appeal was over and the time for certiorari had expired before *Batson* was decided. The state nevertheless argues *Batson* should not apply in this collateral proceeding. *But see Pitts v. Cook*, 923 F.2d 1568, 1571 n. 3 (11th Cir.1991) (*Batson* applies in a habeas case where the petitioner's direct appeal was still pending when *Batson* was decided) (dicta). Because we assume *Batson*'s application, we need not decide this question. Nevertheless, argument on delay is not without all force. It points out that it was not until 1989, when Deputy filed his first habeas petition in the district court, that he requested permission to conduct discovery and expand the record for further exploration of the *Batson* issue and that he should have some obligation to raise an issue within a reasonable time after he became aware of it.

In any event, in the present habeas proceeding in the district court, Deputy filed an affidavit of his trial counsel that contained some evidence that was not put before the state courts in the state post-conviction proceeding. In the affidavit, trial counsel averred that the prosecutor used a peremptory challenge to strike one black venireman and that the jury that convicted Deputy was all white.

■■■ Under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a defendant may establish a *prima facie* case of purposeful discrimination in the exercise of peremptory challenges by showing that the prosecutor used peremptory challenges to remove from the venire a member or members of a particular racial group during the course of trial. *Id.* at 96–98, 106 S.Ct. at 1722–24. If a defendant makes a *prima facie* showing of discrimination, the burden

shifts to the state to produce a race-neutral explanation. *Id.* In *Batson*, the Court required that the defendant be of the same race as the members of the jury removed by way of the peremptory challenge. Subsequently, in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court deleted this requirement.[8] We have said that striking a single black juror might be sufficient to make out a *prima facie* case of racial discrimination even where other blacks were seated on the panel. *See United States v. Clemons*, 843 F.2d 741, 747 (3d Cir.) (dicta) (citing *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir.1987), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988)), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988).

■■■ If the exclusion of one member of any race always makes a *prima facie* case of racial discrimination, every time any party excuses a juror he or she will have to give an explanation, but no *per se* rule concerning the creation of a *prima facie* case exists. Thus, in *Clemons* and again in *Jones v. Ryan*, 987 F.2d 960, 970 (3d Cir.1993), we utilized a five-factor test to determine whether a defendant had presented a *prima facie Batson* issue. The five factors are:

1) how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen
2) the nature of the crime
3) the race of the defendant and the victim
4) the pattern of strikes against racial group jurors in the particular venire
5) the prosecutor's statements and questions during selection.

*Jones*, 987 F.2d at 970–71. Even with counsel's affidavit, Deputy has yet to present any evidence bearing on factors number (1), (4), or (5). Accordingly, we agree with the district court that the record before us does not make a substantial showing that the *Batson* standard has been violated.

■■■ We must still consider, however, whether the district court erred in denying

---

7. In the state post-conviction relief proceedings, where Deputy first raised the *Batson* issue, the state court held the record before it did not show a *prima facie* case under *Batson*.

8. *Powers* appears to imply that all peremptory challenges are now a little less peremptory.

Deputy's request for further discovery on the *Batson* issue. A district court sitting in a habeas case retains the discretion to permit additional discovery if the petitioner presents "good cause" to do so. *See* Rules Governing Section 2254 Cases in the United States District Courts Rule 6(a) (West 1977); *see also Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir.), *cert. denied*, 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 362 (1987).

Deputy does not mention what kind of evidence he seeks to discover that could possibly support his *Batson* claim. Rule 2(c) of the Rules Governing Habeas Corpus Cases expressly provides that petitioner "shall set forth in summary form *the facts* supporting each of the grounds" for relief. *Mayberry*, 821 F.2d at 185 (emphasis added). As we stated in *Mayberry*

> [j]ust as 'habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence,' so also discovery and an evidentiary hearing should not be available to a habeas petitioner who claims relief from the exhaustion rule unless the petitioner sets forth facts with sufficient specificity that the District Court may be able, by examination of the allegations and the response, if any, to determine if further proceedings are appropriate.

*Id.* at 186; *see also Munoz v. Keane*, 777 F.Supp. 282, 287 (S.D.N.Y.1991) ("[P]etitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence."), *aff'd*, 964 F.2d 1295 (2d Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992). When all the circumstances of this case are considered, we cannot say the district court erred in denying discovery. They include: Deputy's failure to raise any question about the composition of the jury in the state courts, the fact that certiorari had been granted in *Batson* before his direct appeals were exhausted and his more than two-year delay thereafter in raising it even though it was decided before his own petition for certiorari was dismissed, his failure to point to any evidence he might discover that would support his *prima facie* case and the death of the prosecutor, the only person who could

refute any *prima facie* case he might discover. Considering all these circumstances, we do not believe Deputy has made a substantial showing that the district court erred when it concluded he had not shown the "good cause" that Rule 6(a) requires before discovery can be granted at this late stage of collateral review. We see no substantial reason to interfere with the discretion the district court exercised in refusing discovery. Had Deputy not delayed raising the *Batson* issue for more than seven years after *Batson* was decided, the situation might be different, but then the state might also have been in a position to rebut any *prima facie* case further discovery might make out if the prosecutor would have still been alive. Considering all the circumstances that surround Deputy's belated *Batson* claim, we conclude that he has not made any substantial showing that the district court erred in denying his last minute request for further discovery.

### III. *Ineffective Assistance of Counsel*

Deputy argues that his counsel was ineffective at both the trial and penalty phases in various ways but states that the "heart" of his ineffectiveness claim is trial counsel's failure, in preparing for the penalty phase of his trial, to investigate, within his family, the mitigating effect of his traumatic childhood and his alcohol dependence that their recollections could have provided. *See* Brief for Appellant at 57.

 Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a habeas petitioner must first show that his attorney's representation fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064. On this issue, *Strickland* instructs us to be deferential to counsel's tactical decisions, not to employ hindsight, and to give counsel the benefit of a strong presumption of reasonableness. *Id.* at 689–90, 104 S.Ct. at 2065–66. In addition, a habeas petitioner must show any ineffectiveness that appears prejudiced the defense. Prejudice is defined as a reasonable probability that the result would have been different but for the unprofessional errors. *Id.* at 691–96, 104 S.Ct. at 2066–69; *see also Frey v. Fulcomer*, 974 F.2d 348, 358 (3d Cir.1992),

cert. denied, —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

■ In *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), defense counsel presented no mitigating evidence at either of two sentencing hearings. *Id.* at 788, 107 S.Ct. at 3122. The Supreme Court, nevertheless, held a reasonable basis existed for defense counsel's tactical decision not to present evidence of his client's troubled family background. The Court noted that the evidence tended to suggest violent tendencies which would be at odds with the defense's strategy of showing that defendant's acts on the night of the murder resulted from his will's being overborne by his codefendant. *Id.* at 792–94, 107 S.Ct. at 3124–25. Deputy's case strongly resembles *Burger.* He says counsel's failure to speak with his family members about his troubled past establishes an objectively unreasonable failure to seek mitigating evidence. Counsel did, however, review extensive and reliable evidence of Deputy's troubled background when he went over the psychiatric reports prepared by expert witnesses for both the state and Deputy. These reports, which fully set out Deputy's troubled past and his alcohol problem, were put before the sentencing jury by stipulation. Counsel was not only aware of mitigating evidence but did, in fact, place it before the jury in the form of the psychiatrists' reports during sentencing, although he did not otherwise emphasize it. This case does not resemble *Kenley v. Armontrout*, 937 F.2d 1298, 1304–09 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991), where counsel failed to investigate mitigating evidence, presented none, and had no tactical reason for failing to do so. Deputy's counsel was aware of his client's past and elected not to adduce additional testimony beyond that contained in the psychiatric reports.

The testimony Deputy presented at the post-conviction relief proceedings from several family members in support of his ineffectiveness claim added little to what was already in the psychiatrists' reports. *See* Brief for Appellee (dated Sept. 7, 1993) at 15–18. We believe that defense counsel's election not to present the testimony of Deputy's family and counselors at sentencing as mitigation evidence was a reasonable tactical decision. Counsel stated he chose to focus on how Deputy had been changed by a religious conversion by the time of the sentencing hearing rather than on Deputy's turbulent past. At the sentencing hearing, there was extensive testimony, including testimony from Deputy himself, about his recent religious transformation. At sentencing, there was also testimony from three ministers and a Bible study instructor about Deputy's religious transformation. Deputy played a tape on which he sang "Amazing Grace." The superior court decided that Deputy himself desired to emphasize his religiously focused future rather than his sordid past. The reasonableness of counsel's actions may have been affected by Deputy's actions and choices. *Cf. United States v. Gray*, 878 F.2d 702, 710 (3d Cir.1989) ("counsel's failure to pursue certain investigations cannot be later challenged as unreasonable when the defendant has given counsel reason to believe that a line of investigation should not be pursued").

The superior court, upon Deputy's motion for post-conviction relief, also concluded that the decision of Deputy's attorney not to call members of Deputy's family was prudent because cross-examination of them had the damaging potential of shifting the focus back to the violent, disturbed, and consistently criminal path Deputy had previously followed. Before making that finding, the state court conducted an eighteen-day Rule 61 post-conviction hearing.

■ On the issue of counsel's failure to seek mitigating evidence, the district court decided that this finding by the state court is supported by the record. We recognize that we are not bound by the state court's ultimate conclusions regarding counsel's performance. "[A] state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court" because it is "a mixed question of law and fact" and not a question of historical fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *see also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Still, the specific historical facts found by a state court

in the course of deciding an ineffectiveness claim are subject to deference by § 2254(d) unless they are not supported by the record. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Reese v. Fulcomer,* 946 F.2d 247, 254 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992).

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Burger,* 483 U.S. at 794, 107 S.Ct. at 3125 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066). "[I]n considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (citation omitted).

In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court held that a defendant had effective assistance at sentencing, despite his claim that counsel spent only the one-half hour between the close of the guilt phase and the start of the penalty phase to prepare. There, counsel possessed the defendant's psychiatric report but chose to rely on a simple plea for mercy from the defendant himself. The Supreme Court held this was a reasonable tactical decision because other possible strategies could have opened the door for the state's presentation of damaging rebuttal evidence. *Id.* at 184–87, 106 S.Ct. at 2473–74; *see also Francis v. Dugger,* 908 F.2d 696, 702–03 (11th Cir.1990) (defendant received effective assistance at sentencing, despite claim that counsel failed to investigate and present mitigating evidence about his impoverished, abused, and socio-economically limited childhood, and evidence of his brain dysfunction diagnosed as fetal alcohol syndrome, because trial counsel made decision to deliver highly impassioned argument which emphasized the Easter season, forgiveness, compassion, and value of life), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991).

[redacted] Deputy has not made a substantial showing that the district court erred in concluding that there was no constitutional deficiency in counsel's performance. Moreover, we do not think Deputy has made any substantial showing of prejudice, as *Strickland* defines it. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. We agree with the district court that there is little probability the result would have been different had members of Deputy's family been called to testify about his troubled past.[9] The evidence that they could have provided was already before the sentencing jury in the form of the psychiatrists' reports.[10] Therefore, we see no probable cause for appeal in Deputy's claims of constitutionally ineffective counsel.

## IV. *Harmless Error as to Evidence Considered on Intentional Murder Conviction*

[redacted] The Supreme Court of Delaware expressly found, on direct appeal, that a second taped confession Deputy made to police after he appeared before the Justice of the Peace was obtained in violation of his Sixth and Fourteenth Amendment right to counsel and was therefore improperly admitted into evidence at trial. *See Deputy II,* 500 A.2d at 592. The supreme court therefore reversed the intentional murder convictions but held

9. At the state post-conviction relief hearing, Deputy called five members of his family. We presume these are the same people he now alleges should have been called at sentencing. Deputy's father presented testimony which included the opinion that his son was demonically possessed. Deputy's father was unable to remember his own age and his testimony can be fairly called confused. Deputy's aunt and three sisters testified to some limited interaction with the defendant but added nothing new to the information in the psychiatric reports. We do not think there has been a substantial showing that the outcome of the penalty phase would have been different had the jury heard this testimony.

10. Deputy also claims counsel was ineffective at the trial level, but there the evidence of guilt was overwhelming. It included Deputy's admission that he was at the scene of the brutal murders, Flamer's statements implicating Deputy in the crime, the victim's wallet and watch found on Deputy's person, his close association with Flamer, the fact that he was with Flamer when he was apprehended, the use of two weapons to stab each victim, and a combined total of approximately 145 stab wounds. After carefully reviewing the record as it relates to this contention, we hold there was no substantial showing of prejudice.

that this error was harmless beyond a reasonable doubt as to the felony-murder convictions. *Id.* The supreme court stated:

Under all the circumstances, we can confidently state that the second statement did not contribute to the jury's guilty verdict as to robbery. Since two murders took place during the commission of the robbery (in which the jury decided that defendant had participated), the elements of felony murder are clearly established. No matter how the evidence was viewed by the jury, a finding of guilt was mandated on the felony murder counts.

*Id.* (citations omitted).

 A state court's conclusion that constitutional error was harmless does not constitute a factual finding entitled to the presumption of correctness. Rather, it is a mixed question of fact and law. *See Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988). Under the standard set forth in *Brecht v. Abrahamson,* — U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), where a constitutional error is a "trial type error" which implicates the weight and effect of evidence presented to the jury, we must ask whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Id.* — U.S. at ——, 113 S.Ct. at 1772 (quotation omitted). We agree with the state court that the illegally obtained second confession which the jury heard before finding Deputy guilty of premeditated murder was harmless on the issue of Deputy's guilt for felony murder and the appropriateness of the death penalty the jury imposed on the felony murder count. In this case, there was ample evidence to support the felony murder conviction without Deputy's illegally obtained second statement to police. In fact, the second statement added nothing to Deputy's first statement other than the fact that he had stabbed one of the victims. *See Deputy II,* 500 A.2d at 592. That improperly admitted piece of evidence led to reversal of his convictions for the premeditated murders. It did not affect the *overwhelming* evidence the jury had before it on his participation in the felony murders without regard to human life.

## V. Enmund *Accomplice Liability*

In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Supreme Court held that the Eighth Amendment prohibits imposition of the death penalty on a defendant who aids and abets a felony in the course of which other principals do the actual killing if he, as an accomplice, does not kill, attempt to kill, intend the killing to take place, or foresee the employment of lethal force. Enmund's case, however, is different than Deputy's. Enmund was the driver of a get-away car. *Id.* at 786 n. 2, 102 S.Ct. at 3370 n. 2. The jury found him guilty of two counts of first-degree murder and one count of robbery. *Id.* at 785, 102 S.Ct. at 3370. Under Florida's death penalty statute, aiding and abetting a felony murder permitted capital punishment. Enmund, as an aider and abettor, was a principal in the crime of first degree murder under the applicable Florida statute. He was sentenced to death under Florida law after the trial judge found no mitigating circumstances and four aggravating circumstances: (1) the capital felony was committed while Enmund was engaged in or was an accomplice in the commission of an armed robbery; (2) the capital felony was committed for pecuniary gain; (3) it was especially heinous, atrocious or cruel; and (4) Enmund was previously convicted of a felony involving the use or threat of violence. *Id.* On appeal, the Florida Supreme Court decided the evidence permitted an inference that Enmund was the person sitting in the driver's seat of a car parked beside the road near the victims' home as well as the further inference that he was waiting there to help the actual robbers escape. From these inferences, the Florida courts concluded that Enmund had aided and abetted the robbery. The Supreme Court of Florida then held Enmund could be subjected to the same punishment as any other principal to the crime of premeditated or felony murder, including capital punishment.

The Supreme Court, after listing and comparing the various state death penalty statutes as they were then worded, was troubled by those which subject an actor in a felony murder to the death penalty without proof that he acted with a *mens rea* that could

make him culpable for the killing itself. It went on to cite Delaware's statute as one requiring the defendant who causes death during commission of a felony to act with a mental state short of intent such as "recklessly" or "with criminal negligence." *Id.* at 790 n. 8, 102 S.Ct. at 3373 n. 8 (quoting Del.Code Ann. tit. 11, §§ 636(a)(2), (6) (1979)). The Court held that imposition of the death penalty without proof that Enmund killed, attempted to kill, or even contemplated the taking of life in the course of the robbery he aided violated the Eighth Amendment and remanded the case for further proceedings to determine Enmund's state of mind. *Id.* at 798, 801, 102 S.Ct. at 3377, 3378.

Five years later in *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Supreme Court made explicit what its remand in *Enmund* implied. It held that the death penalty can be imposed on a defendant who is an accomplice to a felony that results in murder if he is recklessly indifferent to or recklessly disregards human life. *Id.* at 158, 107 S.Ct. at 1688. Tison was convicted of capital murder under Arizona's felony-murder statute for his participation in multiple homicides committed by his father. The state conviction was based on the principle that each participant in a kidnapping or robbery is legally responsible for the acts of his accomplices. Tison had participated in an armed jailbreak that freed his father and another prisoner. It eventually led to the robbery and killing of a family that had stopped along the road to render aid to the Tisons after their escape.

After considering *Enmund,* the state supreme court upheld the death penalty because Tison could have anticipated the use of lethal force during the victims' attempt to flee. *Id.* at 145, 107 S.Ct. at 1681. The Supreme Court affirmed. It concluded that Tison's active participation in events that made murder plainly foreseeable distinguished his case from *Enmund.* Enmund was not present when the victims were murdered and, as driver of the get-away car, did not participate in the actual homicide. Tison, on the other hand, participated in a kidnapping during which it became apparent that

the victims would be murdered. The Supreme Court held these facts supported a finding that Tison was recklessly indifferent to human life and so had the *mens rea* needed to support a death sentence. *Id.* at 158, 107 S.Ct. at 1688.

Here, in instructing the jury at the guilt phase of Deputy's trial, the trial judge stated:

You may find the defendant guilty of the offenses if you are satisfied beyond reasonable doubt that:

(a) The other person performed all of the elements of the offenses charged as I have defined them for you.

(b) The defendant intended, that is, it was his conscious object or purpose to promote or facilitate commission of the offenses.

(c) The defendant aided, counseled, agreed or attempted to aid the other person in committing the offense.

*Deputy II,* 500 A.2d at 599. On his direct appeal in the Delaware Supreme Court, Deputy argued the jury under this instruction could have found him guilty of first degree murder, even if it believed his trial testimony that he did not take part in the actual stabbing of the two victims, merely because he was an accomplice. *Id.* The Delaware Supreme Court rejected that argument. It distinguished *Enmund* because Enmund was a get-away car driver who played no role in the actual killings, but Deputy, like Tison, was present when the killings occurred, actively participated in the commission of the underlying felony of robbery in the first degree, and, at the very least, did nothing to stop the murders or even object to his co-defendant Flamer's acts in committing them. *Id.* Relying on this evidence, the Delaware Supreme Court decided Deputy "was not solely a participant in the underlying felony but was present during, and involved in, the actual murders." *Id.* He was not vicariously liable as a mere accomplice. *Id.* Though the Delaware Supreme Court rejected Deputy's argument, he persists in arguing the jury's finding that he was guilty on all four murder counts was inconsistent with *Enmund* be-

cause it could have been based solely on a theory of accomplice liability.[11]

■ Deputy's tenuous claim that he was a less culpable accomplice ignores 145 stab wounds the record reveals were inflicted upon the two victims by two weapons. Moreover, Deputy possessed one of the victims' watch and wallet the morning after the killings. *See id.* Significantly, Deputy's characterization of the facts is at odds with the Delaware Supreme Court's finding as to his participation, a conclusion accorded a presumption of correctness. In *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Supreme Court cautioned courts of appeals considering habeas petitions to refrain from focusing on the jury instructions when the state court has made its own findings about the basis for the jury's decision. *Id.* at 388–89 & n. 5, 106 S.Ct. at 698 & n. 5. We are also instructed to examine all the state court proceedings to see whether a finding about the defendant's culpability was made at any point in them, either by the jury, the state trial court, or a state appellate court. If such a finding has been made, we must defer to it under the presumption of correctness set out in 28 U.S.C.A. § 2254(d) provided the procedure is not flawed and the conclusion is supported by the record. *Id.* Here, the Delaware Supreme Court has made a finding that Deputy participated in the robbery of two elderly persons and that he did so in reckless disregard of human life. *See Deputy II,* 500 A.2d

at 599. It has support in the record. The imposition of capital punishment on Deputy is consistent with *Tison* and does not contravene *Enmund.* Deputy has made no substantial showing of constitutional error in this respect. We agree with the district court that a certificate of probable cause should not issue on this basis.

## VI. *Jury Composition* [12]

■ Deputy claims that the trial court improperly struck three jurors who had "moral scruples against the death penalty" in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Supreme Court has held that a trial court may excuse a juror for cause where such juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 421, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985) (quotation omitted); *see also Lesko v. Lehman,* 925 F.2d 1527, 1548 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). We have held that a state trial judge's finding that a prospective juror is "impermissibly biased" against the death penalty is entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d). *Lesko,* 925 F.2d at 1548.

■ Deputy claims that jurors Jamison, Errera, and Luff were improperly excluded.[13]

11. At sentencing, the jury was not instructed that it had to find Deputy acted in reckless disregard or with deliberate indifference to life in order to sentence him to death. *See* Volume VIII of the Delaware Superior Court Trial at 400a–405a (Feb. 12, 1982). But, in order to convict Deputy of first-degree felony-murder under the Delaware statute defining felony murder as it did in the guilt phase, the jury had to find that Deputy, "[i]n the course of and in furtherance of the commission ... of a felony ... *recklessly* cause[d] the death of another person." Del.Code Ann., tit. 11, § 636(a)(2) (1987) (emphasis added); *see also id.* § 636(a)(6) (categorizing as first degree murder crimes committed by those who "with criminal negligence, cause[ ] the death of another person in the course of ... commission ... of ... robbery in the first degree.").

12. The Delaware Superior Court explicitly held that the jury selection claim was barred for failure to raise it on direct appeal. Deputy first

raised this claim in his amended motion for postconviction relief. (¶¶ 41–42 of Motion) The district court did not decide this issue on the merits because it held that it had been procedurally defaulted under Del.Super.Ct.Crim.R. 61(i)(3). The Delaware Supreme Court summarily affirmed this decision. *See Deputy III,* 602 A.2d at 1081. Because of the significance of Deputy's claim, as well as his argument that the state did not properly raise procedural default as a bar, we will assume cause and prejudice but will go on to consider the merits of this issue. For the reasons that follow, however, we hold Deputy has not made a substantial showing of constitutional error on this claim either.

13. At oral argument on August 18, 1993, Deputy identified for the first time what he says were three improperly stricken jurors and provided copies of the portions of the voir dire transcript pertaining to them.

These three either gave conflicting responses when asked if they could impose the death penalty or clearly responded in the negative. Jamison answered the court's questions ambiguously but at one point did say her moral opposition to capital punishment would even interfere with her ability to return a guilty verdict. *See* Appendix to Brief for Appellee (dated Sept. 7, 1993) at B302–04.[14] Errera gave conflicting responses to a question about whether she could find a person guilty of murder and a question about imposing the death penalty. She responded "No" the first time and when the question was rephrased she again responded "No." *See id.* at B305–07.[15] Luff flatly responded that he could not find a person guilty of murder and impose the death sentence regardless of the evidence. *See id.* at B308–10.[16] The trial court is in the best position to observe the demeanor of the prospective jurors. Its findings that these jurors had a bias against the death penalty is supported by the record. All three jurors gave responses that showed their partiality and that was sufficient to demonstrate that their ability to carry out their duties as jurors could be impaired.

Therefore, we defer to the trial court's findings of bias. Assuming Deputy's *Witherspoon* claim is not procedurally barred, which we do not decide, we do not believe he presents any substantial showing that his constitutional right to an impartial jury was impaired.

14. The dialogue went as follows:

Q. Are you morally or religiously opposed to capital punishment?
A. Yes, I am.

\* \* \* \* \* \*

Q. Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence in the case should so warrant?
If the evidence in the case should so warrant it, would you have any conscientious scruples against finding a verdict of guilty where the punishment might be death?
A. I don't know how to answer. I would say it depends, you know.
Q. We are talking about if the evidence should so warrant it.
A. Yes.
Q. ... Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death?
A. I don't think so.
Q. Would you have any conscientious scruples against imposing the death penalty ... if the evidence should so warrant [?].
A. I think I would, yes.

\* \* \* \* \* \*

Q. Regardless of any personal beliefs or feelings you may have, if the evidence justified it would you be able to impose the death penalty?
A. Yes.
Appendix to Brief for Appellee at B302–04.

15. The dialogue went as follows: .

Q. Are you morally or religiously opposed to capital punishment?
A. No.
Q. Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence in the case should so warrant?
A. No.
Q. Regardless of any personal beliefs or feelings that you may have, if the evidence in the case justified it would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty?
A. No.
Q. If the evidence in the case justified it, you feel you would not be able to find a person guilty of murder in the first degree and be able to impose the death penalty?
A. No.
Appendix to Brief for Appellee at B306–07.

16. The dialogue went as follows:

Q. Are you morally or religiously opposed to capital punishment?
A. No.
Q. Do you have any conscientious scruples against finding a verdict of guilty where the punishment might be death or against imposing the death penalty if the evidence should so warrant?
A. No.

\* \* \* \* \* \*

Q. Regardless of any personal beliefs or feelings that you may have, if the evidence justified it would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty? .
A. No.
Q. I will repeat the question again. Regardless of any personal beliefs or feelings you may have about capital punishment, if the evidence in the case justified it would you be able to find a person guilty of murder in the first degree and would you be able to impose the death penalty if the evidence in the case justified it?
A. No.
Appendix to Brief for Appellee at B–309–10.

VII. *Use of Felony–Murder to Establish Both a Defendant's Eligibility for Death and the Aggravating Circumstance Warranting its Imposition*

The Tennessee Supreme Court addressed this issue in *Middlebrooks,* and it is squarely presented to us in this habeas proceeding. Under Delaware's capital sentencing scheme, the imposition of the death penalty is limited to persons who are convicted of certain "death-eligible" offenses and who are found to warrant at least one statutory aggravating circumstance. *See* Del.Code Ann. tit. 11, §§ 636, 4209 (1987 & Sup.1992).

In this case, the "death-eligible" offense was felony murder, and the jury found three aggravating circumstances:

1) the murders were committed while the defendant was engaged in the commission of robbery;

2) the defendant's course of conduct resulted in the deaths of two or more persons where the deaths were a probable consequence of the defendant's conduct; and

3) the murders were committed for pecuniary gain.

*See* Del.Code Ann., tit. 11, § 4209(e)(1)(j), (k), (o). Deputy argued before the district court that Delaware's death statute is arbitrary because its dual use of the fact that the murder was committed during the perpetration of a felony as the basis for a finding that a defendant is guilty of felony murder, a capital crime in Delaware, and as one of the aggravating circumstances that justify imposition of the death penalty for that same capital crime, does not sufficiently narrow the class of death-eligible offenders. Deputy additionally notes that the dual use or double-counting of the felony is statutorily mandated. Where the defendant has been convicted of felony murder, "that conviction *shall* establish the existence of a statutory aggravating circumstance...." *Id.* § 4209(e)(2) (emphasis added). Thus, defendants convicted of felony murder receive an "automatic" aggravating circumstance, whereas, for example, defendants convicted of intentional murder do not. Under Delaware's death penalty statute, the jury must double-count a felony murder.

To avoid arbitrary and capricious imposition of death, a capital punishment law must genuinely narrow the class of persons eligible for the death penalty and reasonably justify imposition of a more severe sentence on a particular defendant in comparison with the general class of all defendants found guilty of the crime of first degree murder. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *see also McCleskey v. Kemp,* 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987). Specific aggravating circumstances are required in order to avoid the arbitrary and capricious imposition of capital punishment that was the basis of the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), declaring capital punishment unconstitutional as it was then practiced.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), petitioner had been charged with armed robbery and murder. The trial judge submitted the murder charges to the jury after instructing it that the defendant could be found guilty of either felony murder or premeditated murder. *Id.* at 160, 96 S.Ct. at 2919. The jury returned a general verdict of guilty. The court then instructed the jury that it had to find at least one statutory aggravating circumstance to impose the death penalty. The jury returned a death sentence based on findings that: (1) the murder was committed while the offender was engaged in the commission of other capital felonies, i.e. armed robbery, and (2) that he committed the murder for the purpose of receiving the victims' money and automobile. *Id.* at 161, 96 S.Ct. at 2919. The Supreme Court granted certiorari on petitioner's Eighth and Fourteenth Amendments challenges to imposition of the death sentence on these findings. *Id.* at 162, 96 S.Ct. at 2920. The Supreme Court upheld Gregg's death sentence after concluding, *inter alia,* that the jury's discretion was adequately channeled by the statutory requirement that it find at least one aggravating circumstance before considering any mitigating circumstances. *Id.* at 198, 96 S.Ct. at 2936.

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court considered whether a sentence of death may be imposed upon a single aggravating circumstance, if that single circumstance is also an element of the underlying first-degree murder offense. *Id.* at 233, 108 S.Ct. at 548. It upheld a Louisiana statutory scheme that included in its definition of first-degree murder the element of "specific intent to kill or to inflict great bodily harm [while] ... engaged in the perpetration of ... armed robbery or simple robbery." *Id.* at 242, 108 S.Ct. at 553. The Louisiana death penalty statute, like Georgia's, required a jury to find at least one aggravating circumstance before sentencing a defendant to death.[17] The jury sentenced the defendant to death on three counts of first-degree murder. To support each of these three sentences, it found only one valid statutory aggravating circumstances, namely that the defendant knowingly created a risk of death or bodily harm to more than one person. *Id.* at 243, 108 S.Ct. at 554.[18]

On direct appeal, the Louisiana Supreme Court upheld the three convictions and the sentences. It ruled that the aggravating circumstance was established by the evidence and was sufficient to support the death sentences the jury imposed. *Id.* at 235–36, 108 S.Ct. at 549–50. On habeas, the petitioner in *Lowenfield* raised the issue "whether a sentence of death may validly rest upon a single aggravating circumstance that is a necessary element of the underlying offense of first-degree murder." *Id.* at 236, 108 S.Ct. at 550. He asserted that his death sentence was unconstitutional because the single aggravating circumstance the jury found duplicated an element of the underlying offense of first-degree murder, *id.* at 233, 108 S.Ct. at 548, arguing that the same fact could not do

double duty by establishing guilt and permitting capital punishment. That dual use, he argued, violated the Eighth Amendment's prohibition against arbitrary imposition of a death sentence because it allowed a jury to impose capital punishment on a person within the general class of those eligible for death without confining him to the smaller subclass of those whose especially egregious acts make death an appropriate punishment. *Id.* at 241, 108 S.Ct. at 552.

The Supreme Court rejected this argument. *Id.* It stated that a statutory scheme under which a jury must find at least one aggravating circumstance before it may impose death permits "the jury [to] narrow[ ] the class of persons eligible for the death penalty according to an objective legislative definition." *Id.* at 244, 108 S.Ct. at 554 (citing *Zant*, 462 U.S. at 878, 103 S.Ct. at 2743). This narrowing function can be performed by the jury at either the guilt or the sentencing phase. *Id.* 484 U.S. at 244–45, 108 S.Ct. at 554 (citing *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)). As to the scheme at issue in *Lowenfield*:

> [T]he "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing

---

**17.** The Louisiana statute included among the ten specified aggravating circumstances, although it was not implicated in that case, the circumstance that "the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, ... armed robbery or simple robbery." *Lowenfield*, 484 U.S. at 243 & n. 6, 108 S.Ct. at 554 & n. 6. The Court in *Lowenfield* did not consider the propriety of this particular aggravating circumstance, although it did consider the general

problem that arises when an aggravating factor duplicates an element of the underlying offense.

**18.** The jury also found one murder conviction was further aggravated by another circumstance, that the victim was the witness in a prosecution against the defendant, but the Louisiana Supreme Court held that circumstance unsupported by the evidence. *Lowenfield*, 484 U.S. at 235–36, 108 S.Ct. at 549–50.

phase allows for consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Id.* at 246, 96 S.Ct. at 555. In *Lowenfield,* as in *Gregg,* the Court held the jury's discretion was adequately channeled when the statute precluded it from imposing death unless it found at least one statutory aggravating circumstance.

Following *Gregg* and *Lowenfield,* federal courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous. In *Johnson v. Dugger,* 932 F.2d 1360 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 427, 116 L.Ed.2d 446 (1991), the United States Court of Appeals for the Eleventh Circuit was confronted with a case in which a habeas petitioner, then on his second petition for habeas relief, had been convicted of first-degree felony murder and robbery with a firearm under a statute similar to Delaware's. *Id.* at 1368. Because he was convicted of first-degree felony murder, he argued that the use of the aggravating factors: "in the course of a felony" and "for pecuniary gain," did not sufficiently channel the jury's discretion. The court of appeals held that the Florida statute, which makes a defendant found guilty of felony murder eligible for death and then also permits him to be sentenced to death because the murder was committed in the course of a felony, is constitutional. *Id.* at 1368–69; *see also Bertolotti v. Dugger,* 883 F.2d 1503, 1527–28 (11th Cir.1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990); *Byrne v. Butler,* 845 F.2d 501, 515 & n. 12 (5th Cir.), *cert. denied,* 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988); *cf. United States v. Chandler,* 996 F.2d 1073, 1092–93 (11th Cir.1993), *petition for cert. filed,* 62 U.S.L.W. 3454 (U.S. Dec. 28, 1993) (No. 93–1033).

In Louisiana, first-degree murder requires specific intent to kill. Unlike Delaware, it grades felony-murder as second-degree murder. Therefore, in Louisiana a finding that a defendant is guilty of felony murder does not permit a jury to consider a death sentence. If, however, a defendant has a specific intent to kill, a Louisiana jury can consider death and impose it if the first-degree murder that was specifically intended occurred in the course of a felony. This feature of the Louisiana statute avoids the *Enmund* problem.

■ After considering *Lowenfield,* we conclude that within the context of Delaware's death penalty statute, the provision requiring the double-counting of the felony at the guilt phase and sentencing phase does not impermissibly weaken the statute's constitutionally mandated narrowing function. Therefore, we do not think Deputy has made a substantial showing that his constitutional rights were violated by the jury's consideration of the robbery on both the issue of whether he was guilty of felony murder and the issue of whether his acts warranted death.

## VIII.

Deputy has made no substantial showing of a violation of a federal right, and, therefore, his petition for a certificate of probable cause must be denied. At the same time, we will vacate our stay of execution.

## ORDER

### March 3, 1994

This cause came to be heard on the record from the United States District Court for the District of Delaware and was argued by counsel on August 18, 1993.

On consideration whereof, it is now here ordered and adjudged by this Court that the petition for a certificate of probable cause same is hereby denied. The order entered on August 18, 1993 staying the execution of sentence of death is hereby vacated. Costs taxed against appellant. All of the above in accordance with the opinion of this Court.