**Scott WYNNE, Petitioner,**

**v.**

**Paul RENICO, Respondent.**

**No. 01-10247-BC.**

United States District Court, E.D. Michigan, Northern Division.

Sept. 2, 2003.

John R. Minock, Cramer, Minock, Ann Arbor, MI, for Petitioner.

Brenda E. Turner, Bethany L. Scheib, Michigan Department of Attorney General, Lansing, MI, for Defendant.

***OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS***

LAWSON, District Judge.

Scott Wynne is presently confined at the St. Louis Correctional Facility in St. Louis, Michigan on a state court judgment of sentence for first-degree murder, Mich. Comp. Laws § 750.316, and possession of a firearm in the commission of a felony, Mich. Comp. Laws § 750.227b. He has filed a petition for writ of habeas corpus through his attorney, alleging that he did not receive a fair trial for a number of reasons, including the state court's refusal to permit him to present evidence that he was innocent of the crime and that his chief accuser was likely the actual perpetrator. For the reasons explained in detail below, this Court is convinced that the petitioner's constitutional rights under the Due Process Clause and the Sixth Amendment were abridged, and that the state courts' conclusions otherwise constituted an unreasonable application of clearly established federal constitutional law as determined by the Supreme Court. This Court, therefore, will conditionally grant the writ of habeas corpus pursuant to 28 U.S.C. § 2254, and direct the respondent either to release the petitioner from custody or to conduct a new trial within ninety days.

I.

Philip Timmerman was shot to death on his Allegan County, Michigan farm on the evening of May 18, 1995, between 10:22 p.m. and 10:37 p.m. There were no eyewit-

nesses to the crime. Scott Wynne, the petitioner in this case, was charged with the shooting and, following a jury trial in the Allegan County Circuit Court held from October 16 through November 3, 1995, was found guilty of first-degree murder and possession of a firearm while in the commission of that felony.

Timmerman farmed on land that he had leased, with a purchase option, from the Wynne family. The land had been in the Wynne family for many years, and the petitioner had on several occasions attempted without success to renegotiate the lease and option with Timmerman. In fact, the petitioner wanted to purchase the land himself. The prosecution's theory was that the petitioner's frustration with his unsuccessful dealings with Timmerman over the Wynne ancestral land caused Wynne to murder Timmerman in cold blood. Much of the prosecution's evidence of motive came from Mark Peckham, a childhood friend of the petitioner. However, Wynne contended that Peckham's mental state had deteriorated since high school and he had become a destructive and violent person, who was jealous of the petitioner and sought revenge against him for real or imagined wrongs. Wynne argued that Peckham set out to frame him for Timmerman's murder.

Although Wynne presented some evidence establishing this defense at trial, the jury never heard some of the powerful testimony in support of the defense theory because of the state courts' evidentiary rulings. The police neglected to pursue leads that were consistent with that defense or pointed to a suspect other than the petitioner, and even failed to disclose certain evidence to Wynne's trial counsel. The prosecution's case against Wynne, although constitutionally sufficient, was entirely circumstantial.

Timmerman was shot and killed near his fertilizer truck, which was parked near a barn, while farming his land on the night of May 18, 1995. There were no eyewitnesses to the shooting. However, two farmhands, Brent DeWeerdt and Keith Kohtz, were helping Timmerman plant corn on the night of May 18th. Around 10:00 p.m., Kohtz saw what could have been a flashlight or a parking light on a vehicle near a railroad grade in the area of the tree line which was adjacent to Timmerman's field.

DeWeerdt and Timmerman had taken a semi truck from the farm where the murder occurred to another site around 10:00 p.m. and did not return until close to 10:30 p.m. DeWeerdt indicated that he spoke with his parents from a phone in the barn of the other farm at 10:15 p.m. and that it took between five and ten minutes after that phone call to return to the farm where the murder took place. Upon returning to this first farm, DeWeerdt dropped Timmerman off and Timmerman went to fill some fertilizer tanks while DeWeerdt went to hook up a fertilizer wagon to a flatbed truck. While doing this, DeWeerdt heard five to ten noises which sounded like "pops." When DeWeerdt went looking for Timmerman, he found him lying next to his truck, which was spewing fertilizer. DeWeerdt contacted Kohtz, who was on a tractor in the field, by two-way radio. When Kohtz arrived, he called the 911 emergency telephone number to summon help.

An autopsy revealed that Timmerman had been shot nine times, eight times with .45 caliber bullets and once with a .22 caliber bullet. The petitioner was quickly considered a suspect when Deputy Lon Hoyer of the Allegan County Sheriff Department, who was working the homicide scene, informed Lieutenant Ross of the sheriff's department that they should investigate the petitioner as a suspect. Hoyer informed Ross that he was aware of

problems between the Timmermans and the petitioner and that the petitioner had been a suspect in a prior tire slashing of the victim's farm equipment. Scene measurements that were taken indicated that the direct distance from the homicide scene to the petitioner's house was 1.53 miles. Two sets of footprints were found in the field at the murder scene, and a K–9 dog tracked a human scent to a grassy area on the side of Timmerman's field where the grass was matted down. The K–9 dog showed a great deal of interest in the area and then continued tracking the scent to an abandoned railroad grade and back down towards 118th Avenue where more footprints were observed. The dog continued tracking up the railroad grade to 28th Street to the gravel road, where it lost track of the scent at the intersection of the railroad grade and 28th Street. A cast was made of a footprint found at the railroad grade.

Detective Patrick O'Reilly of the Allegan County Sheriff's Department was also involved in the investigation of the murder. O'Reilly became aware of the petitioner being a possible suspect through conversations with Deputy Hoyer and Sergeant Dale Haverdink. O'Reilly was aware that the victim had been shot with a .45 caliber weapon, and learned through his investigation that the petitioner had a .45 caliber handgun registered to him. O'Reilly then obtained a search warrant for the petitioner's residence. During the execution of the search warrant, police recovered a .45 caliber handgun in a holster with an additional magazine and clip from over a ceiling tile in the petitioner's bedroom. This handgun was, in fact, registered to the petitioner. The petitioner denied putting the handgun in the ceiling and informed the officers that he had last seen it on his bedpost. Tests were performed on this handgun by police and it was determined that it was one of the weapons used to murder Timmerman. Tests also indicated that a fingerprint found on the holster and magazine pouch of the handgun belonged to the petitioner. There was also testimony concerning the police investigation into the slashing of the victim's tractor tires in 1992. During that investigation, police had spoken to the petitioner, but he had denied any involvement with this vandalism of the victim's property.

Deputy Kenneth Blackwell, who had collected evidence, testified that neither the cast of the footprint taken from the railroad grade nor the footprints found at the crime scene matched any shoes that had been taken from the petitioner's home during searches conducted by the police on May 19 and 24, 1995. In addition, the petitioner's clothes, shoes, and the mats from his vehicles were submitted for testing against soil samples taken from Timmerman's farm, but revealed no traces of fertilizer or herbicides that had been used on Timmerman's farm on the night of the murder.

Mark Peckham, a friend of the petitioner's since childhood, contacted the police two days after the shooting. Peckham claimed that the petitioner had told him that he had wanted to kill Timmerman. The petitioner had told Peckham that he and his mother had met with Timmerman in an attempt to get him to release back to them the land that he had leased from the Wynne family, with no success. According to Peckham, the disagreement over the land was a continual problem for the petitioner and he saw the petitioner become more and more upset over the issue. In December of 1992, the petitioner told Peckham that he had slashed the victim's tractor tires. The petitioner began to talk frequently about wanting to kill the victim in September or October of 1993. The petitioner told Peckham that he was running from the industrial park in Allegan to his house to see how long it would take

and further spoke with Peckham about various ways to kill the victim. However, none of the methods that the petitioner mentioned when he discussed killing Timmerman were the way that Timmerman was murdered. Peckham, in fact, conceded that the petitioner had told him that he would not kill Timmerman on his family's property.

Peckham admitted that he had fired the petitioner's guns on numerous occasions and was also aware that the petitioner kept his .45 caliber handgun on his bedpost. Peckham acknowledged that he had worn some camouflage clothing that belonged to the petitioner's sister, September Wynne, while playing paintball the Sunday before the killing. Peckham admitted being at the petitioner's home on the afternoon of the murder, while waiting for the petitioner to come home. No one else was at the petitioner's house while Peckham waited for him. During this time, one of the petitioner's friends and neighbors, Mark Craig Haveman, stopped and talked with Peckham. Peckham finally left the house, but saw the petitioner on the road, spoke to him, and returned to the petitioner's home to wait for him again. Peckham denied going into the house at any time while waiting. Although denying that he killed Timmerman, Peckham testified that if he were to have committed the murder himself he would have worn camouflage clothing and lain in wait.

Peckham testified that the petitioner called him at 9:20 p.m. on the night of the murder and talked for five to seven minutes. However, on cross-examination, Peckham acknowledged that the petitioner's phone call on the night of the murder had been from 10:05 to 10:12 p.m. and that Peckham had left for work shortly after the telephone call.

On cross-examination, Peckham admitted that he described himself as a passive-aggressive person, i.e., someone who would hold his anger in until he acted it out in some indirect way. Peckham denied owning an unregistered 9 millimeter pistol. He denied making the complaint that he worked harder than the petitioner or that the petitioner got more than he deserved or took from his family but gave nothing in return. Inexplicably, Peckham believed that the petitioner had gotten his telephone service cut off after the petitioner stopped calling him with work. Peckham admitted that he knew the access code for the lock to the petitioner's shop and had gone there in March to retrieve his .22 rifle when the petitioner was not home.

Peckham denied telling his insurance agent, Mike Densham, that he was "going to put Scott Wynne away." He further denied that he had made comments to Kathy Hinson, with whom he had worked and who was a chaplain at the county jail, that he had done something so wrong that if the police ever found out he would go to prison for life, or that hunting men was more fun than hunting animals. Peckham claimed that he left for work at 10:30 p.m. on the night of the murder and arrived at 10:50 p.m. Peckham's place of work was in a local industrial park just southwest of 118th Avenue along the abandoned railroad grade and was closer to the murder scene than was the petitioner's home.

Defense counsel attempted to question Peckham about his former girlfriend, Melissa Weeks (Hill). The prosecutor objected to this line of questioning. Outside of the jury's presence, defense counsel made an offer of proof regarding additional facts about Peckham. These included the fact that Peckham had admitted burning down his trailer that he and Weeks shared as revenge on the day she broke up with him, that Peckham had showed Weeks an unregistered 9 millimeter pistol and threatened to kill her if she told anyone about it, that Peckham had vandalized his own

truck and attempted to frame Weeks' new boyfriend for the crime, and that he had sought to enlist a friend to beat or kill his stepfather out of revenge. The trial court ruled that this was inadmissible character evidence and was more prejudicial than probative.

Elizabeth Carns testified that she was a friend of the petitioner and had dated him at one time. The petitioner had told Carns about the dispute that he was having with Timmerman over his mother's land. The petitioner had informed Carns that he was angry with the victim and had tried to get him to change the paperwork for the land. Carns also testified that the petitioner had admitted slashing the victim's tractor tires in 1992.

Mark Craig Havemen testified that he went to the petitioner's home in the late afternoon hours of May 18, 1995 and discovered Peckham there alone. Haveman spoke with Peckham briefly and then left. Haveman testified that the garage doors to the petitioner's house were open. Havemen saw the petitioner the day after the shooting, but the petitioner mentioned nothing about Timmerman. In fact, Haveman testified that the petitioner had recently paid him to move brush piles with a bulldozer off of the land leased by Timmerman so that Timmerman could plant crops near the lot line more easily. Haveman testified that in his opinion, the petitioner was honest and nonviolent.

Christina Haveman, Mark Craig Haveman's daughter-in-law, said that on the night of the murder, she and her husband left to visit her father-in-law at 10:10 p.m. and arrived at his house at 10:30 p.m. She observed a tractor in the fields where Timmerman had been working. When she and her husband left to go home at 11:00 p.m., she saw the petitioner's truck at his house and his bedroom light on. Either on the way to her father-in-law's house at 10:20 p.m. or on the way back at 10:55 p.m., she observed car or truck reflectors down the railroad grade from 28th Street in the direction of the murder scene.

Mark Andrew Haveman's testimony mirrored that of his wife Christina. However, he testified that he observed tail lights from a car or a truck on the abandoned railroad grade at 10:20 p.m., when he and his wife were en route to his father's house. When he passed the petitioner's house both times on the night in question, at 10:20 p.m. and 10:55 p.m., the petitioner's truck and van were parked there.

Prior to and during the trial, the petitioner's mother, Judy Wynne, and her daughter September, had experienced several unusual occurrences, including prowlers in the middle of the night. At the end of the first day of trial, on October 16, 1995, they returned home to find their door wide open. Because they found nothing missing, they did not call the police, but contacted the petitioner's attorney. Defense counsel sent two investigators to check the Wynne home on October 23, 1995. The investigators found a blue duffle bag lying beneath the bed in an unoccupied upstairs bedroom. Inside of the duffel bag they discovered camouflage clothing and a pair of boots with soles similar to the footprints found at the crime scene. The bag also contained a military belt, a canteen, a knife, a tear gas cannister, a mirror, leather gloves, socks, hat, loose ammunition, and a camouflage face painting kit. This bedroom previously had been searched by the police twice and nothing had been found there, nor had one of the defense investigators, Patrick Parr, seen the bag when he went through the house on June 23, 1995.

The duffel bag and its contents were turned over to defense counsel, who in turn, contacted the Allegan County Prosecutor's Office. The bag was ultimately

taken into custody by Sergeant Dean Kapenga of the Allegan County Sheriff's Department and taken to the Michigan State Police Laboratory for testing of the contents. Testing revealed that the petitioner's fingerprint was taken from the tear gas cannister that had been found inside of the duffel bag. An expert in footprint evidence compared the boots found inside the bag with the footprints found at the crime scene and determined that the left boot matched the cast of the footwear impression taken from the crime scene.

On October 30, 1995, the petitioner's counsel filed a motion to dismiss due to the intimidation of witnesses by the police. In this motion, counsel indicated that after he had turned over the duffel bag to the police, Detective Kapenga had threatened defense counsel, the defense investigators, and defense witnesses with being charged criminally as accessories after the fact to murder for planting evidence in order to influence or affect the verdict. In an affidavit attached to the motion, defense counsel stated that the threat of criminal prosecution had affected his ability to effectively represent the petitioner by making him think that he was going to be charged with a crime himself. Counsel sought to have a mistrial declared or the charges dismissed. The trial court denied the motion.

Norma Kawka, the petitioner's girlfriend, testified that the petitioner had spoken with his attorney about changing the lease that the victim had on the land. On the evening of the murder, Kawka went to the petitioner's house and spoke with him. They did not discuss Timmerman. Kawka left at 10:00 p.m. and the petitioner called her at 10:50 p.m. When she called the petitioner the next morning and informed him that the victim was dead, the petitioner was surprised and answered "you're kidding." Kawka was later recalled by the defense and testified that she spoke to the petitioner on May 20, 1995, after the shooting, and told him the details of what she knew about Timmerman's murder. She also testified about the petitioner's whereabouts for the evening in question, as well as the fact that his trucks were at home at the time of the killing. Kawka testified that when she left the petitioner at 10:00 p.m., he was happy and they were making plans for dinner for the following day.

The petitioner's mother, Judy Wynne, testified both in the prosecution's case-in-chief and for the defense. Ms. Wynne testified that Timmerman's lease on the land had been renegotiated in 1992 and that her children had been given a five-year first option to purchase the land from her. Ms. Wynne testified that neither she nor the petitioner had been angry at Timmerman regarding the renegotiation of the option on the lease.

On the day of the murder, Judy Wynne arrived home at 5:45 p.m. The petitioner was speaking with Mark Haveman when she arrived home. The petitioner left home that evening around 8:00 p.m. and his girlfriend Norma Kawka arrived at the home shortly thereafter. Judy Wynne was positive that the petitioner came into the house to take a shower at 10:30 p.m., because her cuckoo clock struck the time.

Stephen Stein, Sr., a neighbor of Timmerman, testified that he heard gunshots on May 18, 1995 about 10:15 to 10:20 p.m. Shortly thereafter, Stein observed fire trucks outside and went toward the Timmerman farm, where his children, nephew, and wife had already gone. As he walked towards the scene, he observed a man, who was not the petitioner, walking west down 118th Avenue, in the opposite direction from the petitioner's house. The man was 6′2″ tall, thin, wearing a T-shirt and jeans, with messy hair. Stein thought the man might be his son and yelled over to him, but the man turned and Stein realized that

it was not his son. The man looked at Stein, appeared startled, and continued walking. Stein thought it was unusual for a person to be walking on foot on a rural road at night. Stein had also seen a white pickup truck in the area around that time.

Matthew Radke had been a good friend of Peckham since high school until 1992, but was no longer his friend due to Peckham's "mental deterioration." The prosecutor objected to this testimony and Radke was only able to testify to the jury that Peckham was untrustworthy. Outside the jury's presence, a separate record was made of Radke's additional testimony that the petitioner sought to have admitted. Radke testified in this separate record that Peckham had vandalized his own truck and had initially blamed someone else, but later admitted that he did it himself and had the repairs paid by his own insurance. Radke said that Peckham talked about avoiding the debts caused by the vandalism of his truck and the arson of his trailer by going into bankruptcy. Peckham admitted to Radke that he had beaten his girlfriend. Peckham once asked Radke if he thought the two men could "take" his stepfather, because he had a grudge against him. Prior to the vandalism of his own truck, Peckham had attempted suicide and when Radke visited him in the hospital, he talked strangely and began to decline mentally after that. Peckham had described himself to Radke as "passive-aggressive" with a penchant for violence and getting revenge in secretive ways. None of this additional testimony was admitted into evidence.

The defense also made a separate record of the proposed testimony of Melissa Hill, Peckham's ex-girlfriend. Melissa Hill had dated and lived with Peckham for five years. Peckham had been violent to her and had vandalized his own truck and had tried to blame her new boyfriend for this act. Peckham had showed her what he claimed was an unregistered handgun, and threatened to kill her with it more than once if she told her family that he possessed it. Peckham would sometimes drive at a high rate of speed and ask her how she felt about dying right then. Hill testified that Peckham's trailer was burned down within twenty-four hours of their break-up and Peckham later admitted that he had committed the arson.

Hill testified further that Peckham was a stalker and burglar with a fetish for stealing women's undergarments. Hill testified that Peckham would use a key obtained from his brother, an apartment complex manager, to break into female tenants' apartments and steal their underwear. Peckham also stole underwear from Hill's girlfriends. Peckham kept a large collection of stolen women's underwear, a list of the names and addresses of the women from whom it was stolen, and the names of those women whose underwear he wanted but had not yet stolen. Defense counsel argued that this fetish was particularly relevant, first, because it established Peckham's readiness to go into persons' homes, and secondly, because a women's petite, black camisole, which did not belong to the Wynnes, had been found underneath the blue duffel bag that had been found in the Wynne household on October 23, 1995.

The petitioner argued that Peckham's stalker and burglar behavior, his character for seeking revenge in secretive ways, his violent tendencies, his mental deterioration, and his readiness to frame other persons supported an inference that he was capable of murdering Timmerman and planting the petitioner's gun afterwards to frame the petitioner for the murder as a means of obtaining revenge against the petitioner. The court excluded this testimony on the grounds that it was not relevant, was more prejudicial than probative,

and there was no evidence that Peckham planted the duffel bag. Defense counsel also made an offer of proof concerning Kathy Hinson's testimony, namely, that Peckham had admitted to her that he had done something so bad that if the police ever found out, he would be put in jail for life, and that it was more fun to hunt men than animals. The court excluded this testimony on the grounds that it was more prejudicial than probative, finding that although Peckham was an important witness, he was not the crucial witness.

Thomas Cole, a defense investigator, testified that he had spoken with Peckham. Peckham told Cole that the petitioner had too easy of a life and had taken from Peckham's family but had not returned anything to them. Cole also testified that there were burrs in the socks found in the duffel bag that were similar to burrs found near the barn where Timmerman's body had been found.

Michael Densham, Peckham's insurance agent, testified that on three or four occasions following Timmerman's murder, Peckham told Densham that he was "going to put Scott Wynne away."

The petitioner testified in his own defense. He was a twenty-six-year-old, self-employed businessman who owned a garage door company that had grossed $197,000 in 1994. The petitioner also owned various rental houses and an apartment building and also worked in the construction and rehabilitation of houses. The petitioner was a licensed builder who had completed 2000 hours towards a journeyman electrical license.

The petitioner testified that on the day of the murder, he came home from work around 5:30 p.m. and spoke with Mark Havemen for one and a half hours before running an errand at 8:00 p.m. The petitioner returned home at 8:30 p.m., where Kawka was waiting for him. Kawka left the house at 10:00 p.m. and the petitioner worked on business invoices before going into the house at 10:25 p.m. The petitioner took a shower and called Kawka at 10:50 p.m. On Saturday, May 20, 1995, the petitioner spoke with Kawka and was shocked when he was informed by her that Timmerman had been murdered.

The petitioner denied ever telling Peckham that he planned on killing Timmerman. Although he acknowledged that he thought his mother had set too low of a price for the land that she had leased to Timmerman, he thought it was only $20,000 too low. The petitioner was aware that he had an option to purchase the land. Although it was not part of his plans, had he wanted to purchase the land, his maternal grandfather was wealthy and would have assisted him with financing it.

The petitioner testified that the boots and the other items found in the duffel bag were not his, although some of the camouflage clothing had belonged to his sister from when she was in the army and he had previously given a tear gas cannister like the one found in the bag to Peckham after playing paintball on the Sunday prior to the murder.

The jury found the petitioner guilty of first-degree murder and felony firearm, and he was sentenced to life in prison without parole on the murder charge and two years imprisonment on the felony firearm count on January 5, 1996. He filed a timely motion for new trial, raising several grounds, including a claim that newly discovered evidence required a new trial. The trial court conducted a lengthy evidentiary hearing, and denied the motion in an opinion and order dated August 13, 1998. The petitioner timely pursued an appeal in the Michigan Court of Appeals, raising, *inter alia,* all of the issues that he presents to this Court. The court of appeals rejected the petitioner's arguments, for reasons discussed in detail below, and affirmed his

conviction in an unpublished opinion. *See People v. Wynne,* No. 192512, 1999 WL 33328893 (Mich.Ct.App. Dec. 3, 1999). The state supreme court denied the petitioner's application for leave to appeal. *See People v. Wynne,* 463 Mich. 876, 618 N.W.2d 595 (2000).

On June 15, 2001, the petitioner filed the present petition for writ of habeas corpus, raising the following grounds:

I. The petitioner was denied the right to present a defense where the trial court excluded defense evidence that he was framed by the key prosecution witness who may have committed the murder.

II. Where testimony from witnesses who lived close to the scene suggested a different killer or killers was not presented at trial, the petitioner was deprived of due process, either because the prosecutor withheld information [that] should have been turned over to the defense, or because the petitioner was deprived of effective assistance of counsel.

III. The petitioner was deprived of his rights to due process and to counsel because the prosecutor intimidated defense counsel and defense witnesses during trial by threatening to bring criminal charges against them.

IV. The petitioner was deprived of a full and fair opportunity to litigate [a] Fourth Amendment issue regarding the May 19, 1995, search warrant, because the record does not support the state court factual findings, and on the merits the search warrant affidavit contained false information made in reckless disregard for the truth and misleading and material omissions, and did not establish probable cause.

V. The petitioner was denied his state and federal due process rights to a fair trial where the trial court merely instructed the jury that a reasonable doubt is a doubt that is reasonable even after the prosecutor denigrated the reasonable doubt standard.

The respondent filed an answer challenging the merits of the petition, together with the Rule 5 materials, on November 28, 2001. The respondent has not raised any substantial procedural defenses, but rather contends that the petitioner is not entitled to relief under 28 U.S.C. § 2254(d), as that statute has been amended by the Antiterrorism and Effective Death Penalty Act of 1996.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, altered the standard of review federal courts must apply when reviewing applications for a writ of habeas corpus. The AEDPA applies to all habeas petitions filed after the effective date of the Act, April 24, 1996. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Because the petitioner's application was filed after April 24, 1996, the provisions of the AEDPA, including the amended standard of review, apply to this case.

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins v. Smith,* — U.S. —, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also Cremeans v. Chapleau,* 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous.").

The United States Supreme Court has explained the proper construction of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases....
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495.

The Supreme Court held that a federal court should invoke the "unreasonable application" clause of § 2254(d)(1) and issue the writ "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable....
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law.... Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410, 411, 120 S.Ct. 1495. *See also Lewis v. Wilkinson,* 307 F.3d 413, 418 (6th Cir.2002).

With these standards in mind, the Court proceeds to the merits of the petition.

### A.

The petitioner's theory at trial was that prosecution witness Mark Peckham was not only the actual murderer, but also that Peckham had planted and manipulated evidence to make it appear that the petitioner killed Philip Timmerman. The petitioner theorized that Peckham sought revenge against him for real or imagined wrongs, and that Peckham killed Timmerman in a

way that implicated the petitioner in the crime. According to the petitioner, Peckham achieved this goal by taking the petitioner's .45 caliber handgun from the petitioner's home, shooting Timmerman, and then returning the weapon, hiding it above the ceiling tiles back at the petitioner's house. In addition, the petitioner believed that Peckham had planted a duffle full of evidence, including shoes and other clothing linked to the murder scene, in the petitioner's home while the trial was ongoing.

The petitioner sought to prove this theory at trial by offering evidence that Peckham previously had engaged in a similar modus operandi when he took revenge on his girlfriend, Melissa Weeks (Hill), after she broke up with him. The petitioner sought to prove that Peckham had burned down a trailer that he shared with his girlfriend Melissa Weeks (Hill) in an act of revenge and then vandalized his own truck and had attempted to blame it on Weeks' new boyfriend. Additional evidence of Peckham's scheme of exacting revenge on other occasions, excluded by the trial court, consisted of testimony that Peckham had been violent towards Weeks, and testimony from Matthew Radke that Peckham had admitted that he had a passive-aggressive personality, had a penchant for violence, and sought revenge in secretive ways. To support the theory that Peckham had planted the duffle in the petitioner's house during the trial, the petitioner offered evidence that Peckham had burglarized homes for the purpose of stealing women's undergarments, which he collected, inasmuch as a "signature" camisole, belonging neither to the defendant's mother nor sister, was discovered with the blue duffle full of evidence in a location that previously had been searched on more than one occasion by both police and defense investigators. Finally, the petitioner sought to introduce evidence of an oblique admission by Peckham through the testimony of Kathy Hinson, to whom Peckham allegedly said that he had done something so bad that if the police ever found out, he would be put in jail for life, and that it was more fun to hunt men than animals.

This evidence, coupled with other admitted testimony that established that Peckham had the means and opportunity to commit the homicide with the petitioner's handgun, paints a convincing picture of the petitioner's innocence and Peckham's guilt. The jury, however, was not able to assess these submissions, or evaluate the entire spectrum of evidence offered in support of the defense theory.

The respondent contends that this claim consists of nothing more than state law evidentiary questions, and points to the state court of appeals' opinion, which decided the issue based on its view of the Michigan Rules of Evidence. The ruling on this issue is contained in a single paragraph:

> Defendant next argues that he was denied the right to impeach prosecution witness, Mark Peckham, and demonstrate that Peckham had committed the murder. We disagree. Defendant offered evidence in the form of testimony of other "witnesses" concerning various things Peckham had said or done in the past. Testimony regarding Peckham's past violence and criminal acts, offered to prove that he acted in conformity therewith, constituted improper impeachment under MRE 404(b). Testimony regarding his sexual proclivities was inadmissible because it was unrelated to truthfulness. *People v. Chaplin,* 412 Mich. 219, 225–226, 313 N.W.2d 899 (1981). Testimony offered to contradict Peckham's testimony was inadmissible because a proper foundation for impeachment did not occur, *People v. Barnett,* 165 Mich.App. 311, 315, 418 N.W.2d 445 (1987), and it constituted impeach-

ment by extrinsic evidence on a collateral matter. *People v. Sutherland,* 149 Mich.App. 161, 165–166, 385 N.W.2d 637 (1985). Testimony regarding Peckham's history of mental illness was inadmissible because defendant failed to establish that the information was temporally relevant, that is, that any mental illness was suffered by Peckham and affected his memory, ability to perceive reality, or tell the truth. *United States v. Jackson,* 863 F.Supp. 1462, 1465 (D.Kan. 1994).

*People v. Wynne,* 1999 WL 33328893 at *1.

To be sure, errors in state evidence law will not support the issuance of the writ unless those errors rendered the trial fundamentally unfair. *See Clemmons v. Sowders,* 34 F.3d 352, 357 (6th Cir.1994) (holding that "[h]abeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation"). The Court of Appeals for the Sixth Circuit has explained that

> "[e]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (quoting *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)); *see also Spencer v. Texas,* 385 U.S. 554, 563–64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

*Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001) (second alteration in original). However, this Court finds that the petitioner has raised an issue of constitutional dimension that was neither properly addressed nor correctly decided by the state courts: the right to present a defense incorporated in the Sixth Amendment.

The failure of the state court of appeals to directly address the petitioner's constitutional claim implicates the standard of review that this Court must apply. The Sixth Circuit has recently observed that "[w]here ... the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under the AEDPA does not apply." *Maples v. Stegall,* 340 F.3d 433, at 437 (6th Cir.2003). The court took its cue on this issue from *Wiggins v. Smith,* — U.S. —, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), where the Supreme Court considered an ineffective assistance of counsel claim on habeas review in which the state court had never analyzed the prejudice prong of the applicable test. Under those circumstances, the *Wiggins* Court concluded that its "review [wa]s not circumscribed by a state court conclusion," *Id.* at 2542, and instead conducted a *de novo* review. Nonetheless, this Court finds that the petitioner prevails on this issue under the more stringent standards of the AEDPA, and will assess the claim by that standard.

The Compulsory Process Clause of the Sixth Amendment provides an accused with the right to "compulsory process for obtaining witnesses in his favor," U.S. Const. amend VI, a crucial part of the Constitution's more basic guarantee of "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). As applied to the States by the Due Process Clause of the Fourteenth Amendment, the accused has the right at trial to present testimony that

is "relevant," "material," and "vital to the defense." *Washington v. Texas,* 388 U.S. 14, 16, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). *See also Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' ") (internal citations omitted). The "right to present relevant evidence is not unlimited," and "is subject to reasonable restrictions" imposed by the criminal process. *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

> As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Ibid.* (citations and quotation omitted).

In *Washington v. Texas,* the petitioner was convicted of malicious murder arising from the shooting of the mother of his ex-girlfriend. Both Washington and one Charles Fuller were present when the gun was fired. Washington testified at his trial that he did not shoot the deceased, and had in fact been running back to his vehicle when he heard a shot ring out, presumably discharged by Fuller. Fuller was not allowed to corroborate this version of events at trial because he had earlier been convicted of the same murder, and under Texas evidence law persons charged as accomplices in the same crime were not permitted to testify on behalf of one another. The petitioner's conviction was upheld by the Texas courts, but the Supreme Court reversed, finding that "the right to present ... witnesses to establish a defense ... is a fundamental element of due process of law." *See* 388 U.S. at 19, 87 S.Ct. 1920. The Court found the Texas rule in question—which prohibited the accomplice from testifying for his co-participant, but not the prosecution—to be "absurd" and "arbitrary," ruling that "[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." *Id.* at 23, 87 S.Ct. 1920.

A similar problem arose in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), where the defendant was tried for the murder of a police officer. The defendant was accused after evidence established that the slain deputy had discharged his firearm at his likely assailant and that Chambers had been struck by one of the bullets. Chambers insisted that he was innocent, and demanded to call at trial a Gable McDonald, who initially confessed to the shooting to Chambers's attorneys, but later recanted at a preliminary examination. At trial, Chambers sought to prove not only that he did not shoot the officer, but that McDonald did. Although he was able to present testimony that McDonald was in fact the shooter, he was not able to call McDonald to the stand himself because of Mississippi's common-law "voucher" rule, which provided that a party could not impeach his own witness. Furthermore, the trial court refused to permit Chambers to call three witnesses who would have testified that McDonald confessed to them as well because Mississippi did not recognize a hearsay exception for statements against penal interest.

The Supreme Court concluded that Chambers' inability to call and cross-examine McDonald, combined with the trial court's prohibition on the introduction of the witnesses' hearsay testimony, violated Chambers' due process rights. With regard to the requested testimony of McDonald, the Court recognized that "the right to confront ... is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 295, 93 S.Ct. 1038. As an example of such an interest, the Court cited to *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), in which the Court held that the trial court's inability to compel the attendance of a foreign national did not abridge the defendant's right under the Confrontation Clause. Nonetheless, the "denial or significant diminution" of this right "calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Chambers,* 410 U.S. at 295, 93 S.Ct. 1038 (quoting *Berger v. California,* 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969)). Because "the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend" on who actually called the witness, the Supreme Court concluded that the voucher rule "plainly interfered with Chambers' right to defend against the State's charges." *Id.* at 298, 93 S.Ct. 1038.

The Court found that it need not decide whether the Confrontation Clause violation itself would be enough to reverse the conviction, as Chambers had argued that it was the combination of his inability to cross-examine and his inability to call witnesses that violated his due process rights. *Ibid. See also Davis v. Jabe,* 824 F.2d 483, 486 (6th Cir.1987), *cert. denied,* 484 U.S. 988, 108 S.Ct. 509, 98 L.Ed.2d 507 (1987). Proceeding to the exclusion of the three hearsay witnesses, the Court recognized the State's interest in prohibiting introduction of hearsay generally, but found that such a rule must yield to the defendant's due process interests when sufficient indicia of reliability underscore the statements allegedly made. *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038 (noting that because "[t]hat testimony was also critical to Chambers' defense, ... the hearsay rule may not be applied mechanistically to defeat the ends of justice"). The reliability of the statements was supported by their spontaneity to close acquaintances, their corroboration by other evidence, and the reality that the statements were manifestly against McDonald's penal interest. *Id.* at 300–01, 93 S.Ct. 1038. Together "with the State's refusal to permit Chambers to cross-examine McDonald," "the exclusion of this critical evidence" denied Chambers due process of law. *Id.* at 302, 93 S.Ct. 1038. *See also Crane v. Kentucky,* 476 U.S. 683, 689–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (holding that the State deprived the defendant of his right to due process by denying him the opportunity to present evidence at trial concerning the voluntariness of his confession on the basis of a state rule permitting such evidence only to be introduced at pretrial hearings).

In *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Supreme Court explained that the defendant's right to present a defense at trial trumped not only "arbitrary" state procedural rules, but also those "disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Id.* at 56, 107 S.Ct. 2704. In *Rock,* the Court addressed an Arkansas rule of evidence that categorically excluded testimony that was derived from hypnosis sessions. Applying the rule, the trial judge had forbidden the defendant from

providing any testimony other than that which she had recalled prior to her hypnosis sessions. Although it recognized that several other states applied a similar rule, the Court found that the effect of the rule was to "prevent[ ] her from describing any of the events that occurred on the day of the shooting, despite corroboration of many of those events by other witnesses." *Id.* at 57, 107 S.Ct. 2704. In light of the evidence corroborating the details of the defendant's hypnotically refreshed testimony, the tape recordings of the hypnosis sessions, and the trial court's finding that the hypnotist did not use leading questions, the trial court erred by not weighing the defendant's right to present testimony against the interests advanced by the hypnosis rule. *Id.* at 61–62, 107 S.Ct. 2704. Accordingly, the Court vacated the conviction and remanded the matter for further proceedings.

It is clear that the defendant's right to present evidence is not absolute, and that the State may place reasonable limitations on the introduction of evidence in criminal proceedings. *See, e.g., United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (holding that the proscription against the introduction of polygraph examination results contained in Military Rule of Evidence 707 did not violate the Due Process Clause). However, the unavoidable conclusion to be drawn from the Supreme Court's cases is that the "the right to present . . . witnesses to establish a defense" is clearly established as "a fundamental element of due process of law." *See Washington,* 388 U.S. at 19, 87 S.Ct. 1920. State evidence rules must yield to this fundamental right when they "plainly interfere[ ] with [the defendant's] right to defend against the State's charges," *Chambers,* 410 U.S. at 298, 93 S.Ct. 1038, particularly when such rules are "disproportionate to the purposes they are designed to serve." *Rock,* 483 U.S. at 56, 107 S.Ct. 2704. A state court's interpretation of its evidence rules that results in the denial of the defendant's right to present a defense, most notably the defense of third-party culpability as in *Chambers,* especially when the state court interprets the evidence rules incorrectly, is an unreasonable application of this clearly established constitutional rule. *See Wade v. Mantello,* 333 F.3d 51, 58 (2d Cir.2003) (holding that a claim that evidence of another's guilt was improperly excluded "is based upon clearly established federal law, as determined by the Supreme Court. The Constitution protects a criminal defendant from the arbitrary exclusion of material evidence, and evidence establishing third-party culpability is material.").

In the present case, the petitioner's attack against the prosecution witness was two-pronged: he sought both to discredit and accuse him. The petitioner also sought to undermine the probative force of the State's circumstantial evidence by linking it to Peckham's scheme to "frame" the petitioner. The state court of appeals, however, limited its view of the relevance of the petitioner's proffered evidence by considering it only as an attack on Peckham's "character." This narrow view resulted in an abridgement of the defendant's constitutional right to present a defense, as clearly established by the Supreme Court. Evidence that someone other than the defendant may have committed the crime is critical exculpatory evidence that the defendant is entitled to present to the jury. *See United States v. Armstrong,* 621 F.2d 951, 953 (9th Cir. 1980) (citing *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038, and holding that "[f]undamental standards of relevancy, subject to the discretion of the court to exclude cumulative evidence and to insure orderly presentation of a case, require the admission of testimony which tends to prove that a person other than the defendant commit-

ted the crime that is charged."). This is particularly true in cases like this one, where there is evidence that suggests that the prosecution's main witness may be the actual perpetrator. Such evidence should be admitted even where the defense theory is purely speculative, since it is the jury's role to consider the evidence and determine whether it presents "legitimate alternative theories for how the crime occurred." *Gray v. Klauser,* 282 F.3d 633, 649 (9th Cir.2002) (quoting *United States v. Vallejo,* 237 F.3d 1008, 1023 (9th Cir. 2001)).

Likewise, extrinsic proof tending to establish a reason on the part of a witness to fabricate is never collateral and may not be excluded on that ground. *Justice v. Hoke,* 90 F.3d 43, 48 (2d Cir.1996) (granting habeas relief where such evidence was excluded). "[I]t is axiomatic that defense counsel should be permitted to expose to the jury facts relevant to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding. Such information is 'always relevant as discrediting the witness and affecting the weight of his testimony.' " *Wilkerson v. Cain,* 233 F.3d 886, 890 (5th Cir.2000) (some internal quotation omitted).

In this case, the state court of appeals held that evidence of Peckham's conduct toward his former girlfriend and her new boyfriend, and the evidence of his theft of women's undergarments, was impermissible propensity evidence excludable under the first sentence of Michigan Rule of Evidence 404(b), which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." It is clear from the record, however, that the evidence was not offered as proof of Peckham's character or a character trait. Rather, the defense intended to show Peckham's "system in doing an act," *see* Mich. R. Evid. 404(b), in the manner of seeking revenge upon the defendant by accusing him of a crime that Peckham, himself, committed. Likewise, proof that Peckham stole women's undergarments, to which he allegedly had a strange attachment, linked him to the incriminating evidence tied to the crime scene that the petitioner says was "planted" at his home during the trial. Thus, according to state evidence law, since the chain of inferences that made this evidence relevant did not require a detour through Peckham's character, the first sentence of Rule 404(b) should not have served as an obstacle to admissibility. *See People v. VanderVliet,* 444 Mich. 52, 64, 508 N.W.2d 114, 121 (1993) (holding that "if the proffered other acts evidence is logically relevant, and does not involve the intermediate inference of character, Rule 404(b) is not implicated").

Moreover, Peckham's statements to Kathy Hinson that he had done something so bad that if the police ever found out he would go to prison for life, and that hunting men was more fun than hunting animals, was not extrinsic evidence on a "collateral" matter; rather, it was probative of Peckham's own guilt because, in light of the other evidence of motive and opportunity, the jury could have inferred from these statements that Peckham was alluding to the murder of Timmerman. Such evidence would have tended to inculpate Peckham as it exculpated the petitioner. *See Chambers,* 410 U.S. at 296–98, 93 S.Ct. 1038.

The Court finds that the state courts' exclusion of the evidence under the circumstances amounted to an unreasonable application of clearly established federal law as determined by the Supreme Court. If this constitutional violation is not harmless, the petitioner is entitled to relief. *See Lewis v. Wilkinson,* 307 F.3d 413, 422 (6th Cir.2002). "The test for harmless er-

ror, for purposes of determining habeas corpus relief, is whether the error made at trial 'had a substantial and injurious effect or influence in determining the jury's verdict, rather than whether the error was harmless beyond a reasonable doubt.'" *Ibid.* (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). "This standard of review requires the reviewing court to examine the effect of the error on the jury rather than the sufficiency of the evidence at trial." *Calvert v. Wilson,* 288 F.3d 823, 833 (6th Cir.2002).

This Court has little trouble concluding that the improperly excluded evidence would have substantially influenced the jury's verdict. The failure to allow the jury to consider relevant and highly probative evidence of the guilt of a third party, who also happened to be the prosecution's main witness establishing the petitioner's motive, undermines confidence in the outcome of the case and rendered the trial fundamentally unfair.

There were no eyewitnesses to the shooting. The circumstantial evidence against the petitioner, although adequate, was nonetheless equivocal. The prosecution posited that the petitioner was upset that Philip Timmerman would not renegotiate his option to purchase property coveted by the petitioner, a theory supported by Peckham's testimony. But this theory was contradicted by the testimony of Judy Wynne that she had renegotiated the lease with Timmerman in 1992 and had given her children the first option to purchase the property.

Moreover, the prosecution's theory of how the petitioner actually went about committing the murder was weakened by other evidence in this case. Although the evidence established that the petitioner's house was only 1.53 miles from the victim's house, because the prosecution claimed that a footprint found by the railroad grade near 28th Street was made by the boot belatedly discovered inside the duffel bag that turned up in the petitioner's house, coupled with evidence of the route that the tracking dog followed, the petitioner would have had to hike 2.7 miles on foot from his home through woods and fields and along an abandoned railroad grade at night, lay in wait long enough for the grass to have matted down, kill Timmerman, and then return to his home. However, there was testimony that the petitioner's girlfriend, Norma Kawka, left the petitioner at his house at 10:00 p.m. on the night of the murder, and Judy Wynne testified that the petitioner took a shower at his house at 10:30 p.m. that night. Kawka said that she spoke with the petitioner by telephone at 10:50 p.m. Although the circumstances do not render impossible the prosecution's theory, there is certainly room to doubt the state's theory and consider an alternative that would involve a different killer.

Stephen Stein, Sr. testified that he observed another man walking away from the crime scene in a suspicious manner at the time of the murder. Stein's testimony was bolstered by the testimony of Christina and Mark Andrew Haveman, who observed the tail lights from a car or truck near the railroad grade from 28th Street in the direction of the murder scene at about the time that Timmerman was shot. In addition, there was evidence in the record that Peckham had the opportunity to obtain the petitioner's pistol, which was the likely murder weapon, and other evidence that connected Peckham to the clothing and other artifacts that later turned up in the duffle at the petitioner's house. The excluded evidence of Peckham's method of seeking revenge, his theft of women's underwear that associated him with the camisole discovered with the duffle, and his cryptic admissions to Kathy Hinson, may well have furnished the miss-

ing links in the chain of evidence that would connect him to the killing and exonerate the petitioner.

The state courts' unreasonable application of clearly established federal law has resulted in the denial of the petitioner's federal constitutional right to present a defense and requires the issuance of the writ of habeas corpus.

B.

The reaction of the police to the mid-trial discovery of the duffle full of evidence provides the basis for other claims of the petitioner. The prosecutor apparently discounted immediately the suggestion that the evidence was planted by Mark Peckham, and instead a detective announced that he suspected defense counsel and some of the defendant's witnesses of tampering with the evidence in order to influence the jury, and threatened to charge them as accessories to murder. The petitioner contends that the State thereby created a conflict of interest depriving him of his Sixth Amendment right to the effective assistance of counsel, and impermissibly intimidated witnesses in violation of the Due Process Clause.

Defense trial counsel testified at the motion for new trial hearing that his client's mother and sister immediately turned over the evidence to him after it was discovered. Defense counsel offered to give the evidence to the prosecutor that same night, but when the offer was refused he gave the evidence to the court the following day. It was then that defense counsel and the witnesses were accused and threatened. Defense counsel responded with a motion to dismiss, which was denied. He testified that he was intimidated by the threat of prosecution, and he believed the threats were a continuation of the prosecution's pretrial effort to disqualify him from representing the petitioner. Nonetheless, defense counsel permitted the detective to interview the defense investigator about the discovery and he submitted to an interview himself. The detective also interviewed the petitioner's mother and sister. These witnesses also submitted hair samples and fingerprints, as did defense counsel, since several hairs and latent prints were discovered in the duffle.

The state court of appeals determined that the threats by the police towards the petitioner's witnesses were harmless, because they did not prevent the witnesses from testifying. That court also rejected the petitioner's claim of ineffective assistance of counsel, observing that defense counsel never withdrew from the case as a result of the threats, so there was no evidence that the police threats impacted counsel's ability to represent the petitioner effectively. *People v. Wynne,* 1999 WL 33328893 at *1–2.

1.

The view of the state court of appeals that defense counsel actually would have had to withdraw from the case to establish a constitutional violation of the petitioner's rights was not correct. Nevertheless, after canvassing the Supreme Court's cases on the subject, this Court does not find that an abridgment of the petitioner's right to counsel occurred.

As a general rule, to make out a claim of ineffective assistance of counsel under the Sixth Amendment, a petitioner must prove that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's deficient performance prejudiced the petitioner, by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington,* 466 U.S. 668, 687, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

However, in cases where "the process loses its character as a confrontation between adversaries," the prejudice inquiry is truncated. *United States v. Cronic,* 466 U.S. 648, 656–57, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Those circumstances include cases in which there is a complete denial of counsel, where there is an utter failure by counsel to subject the prosecution's case to meaningful adversarial testing, and "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell v. Cone,* 535 U.S. 685, 695–96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). They also include cases in which counsel is laboring under an actual conflict of interest. *See Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Ibid.*

The presumption of prejudice employed in cases of conflict of interest, however, is not quite as strict as in the three categories identified by the Court in *Bell.* As the Supreme Court explained in *Strickland:*

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan,* 446 U.S. at 345–350, 100 S.Ct. 1708, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.,* Fed. R.Crim. Pro. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan, supra,* 446 U.S. at 350, 100 S.Ct. 1708 (footnote omitted).

*Strickland,* 466 U.S. at 691–92, 104 S.Ct. 2052.

A variant of this rule occurs when the trial court is informed of a conflict, as in the case of multiple representation, and fails to make a timely and appropriate inquiry. *See Holloway v. Arkansas,* 435 U.S. 475, 484–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). In all other such cases, however, the petitioner must show that his lawyer's performance was hampered by an actual conflict of interest, which "may be demonstrated by pointing to 'specific instances in the record' that indicate that the attorney 'made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical.' " *Riggs v. United States,* 209 F.3d 828, 831–32 (6th Cir.2000) (quoting *Thomas v. Foltz,* 818 F.2d 476, 481 (6th Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987)).

In this case, the conflict urged by the petitioner is not between the interests of two clients represented by one attorney, but between the petitioner and his attorney's own self-interest in avoiding criminal prosecution for tampering with evidence. Such a circumstance indeed raises a grave *potential* conflict of interest. However, in order for prejudice to presumed, the petitioner must show that "an actual conflict of

interest adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (quoting *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708). The record here does not demonstrate that trial counsel's performance was compromised. Although defense trial counsel testified at the motion for new trial hearing that he felt "intimidated" by the state's threats, there is no indication that those threats dampened the vigor of his advocacy for the petitioner. He fully cooperated with the police in the examination of the duffle and its contents so that a link to Mark Peckham might be discovered. He submitted to an interview and gave fingerprint and hair samples, and encouraged defense witnesses to do so as well. It is true that the State's enthusiasm in pursuing these leads was minimal. For instance, the state apparently did not conduct DNA testing on hair found inside of the duffel bag, or test the fingerprints found on the face paint mirror that was found inside of the bag. *See* Tr. of Mot. for New Trial, vol. I at 59. Such testing could have established that a third party handled the bag and "planted" it at the home to incriminate the petitioner. However, poor police work cannot be attributed to the defendant's trial lawyer. Moreover, since relief is granted on the first claim, if the State chooses to retry the petitioner, this important evidence, which surely the State has preserved, can now be tested and the results made available.

To be sure, an actual conflict of interest arises where "an attorney engages in wrongful conduct related to the charge for which the client is on trial." *United States v. Fulton,* 5 F.3d 605, 609 (2d Cir.1993). However, defense counsel in this case denied that he had tampered with the evidence, and there is no evidence in the record that contradicts that denial. This present case more closely parallels the circumstances in *United States v. Wallace,* 276 F.3d 360, 367–68 (7th Cir.), *cert. denied,* 536 U.S. 924, 122 S.Ct. 2592, 153 L.Ed.2d 781 (2002), where the court found that defense counsel's performance was not ineffective based upon an actual conflict of interest when, although the government alleged that defense counsel engaged in witness tampering with the defendant, the defendant presented no evidence that defense counsel engaged in such conduct, he submitted an affidavit denying that witness tampering occurred, and the defendant presented no evidence that defense counsel's alleged conflict of interest caused an adverse impact.

Because there is no evidence of an actual conflict of interest on the part of the petitioner's trial counsel, the Court will not grant habeas relief on the basis of the petitioner's contention that his Sixth Amendment right to counsel was abridged by the State's threats of prosecution made against defense trial counsel in connection with the discovery of the duffle in the petitioner's home.

2.

This Court agrees with the state court of appeals that the police threats against the petitioner's witnesses to prosecute them did not result in a constitutional violation. Prosecutorial actions aimed at discouraging defense witnesses from testifying on a defendant's may behalf deprive a defendant of his right to due process. *United States v. Pierce,* 62 F.3d 818, 832 (6th Cir.1995) (citing *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)). However, even where a defendant can prove prosecutorial misconduct that amounts to substantial interference with a witness, such misconduct will not require a new trial if it is harmless. *United States v. Foster,* 128 F.3d 949, 953 (6th Cir.1997), *cert. denied,* — U.S. —, 123 S.Ct. 1320, 154 L.Ed.2d 1071 (2003) (citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255–256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)). A defen-

dant who claims that he was denied due process of law through government intimidation of defense witnesses must establish, as a "threshold matter," that the actions of the government "worked to deprive him of a witness who would have testified on his behalf." *United States v. Stewart,* 820 F.2d 370, 375 (11th Cir.1987).

In the present case, the record discloses no such deprivation because all of the witnesses whom the petitioner sought appeared in court and testified on his behalf. In light of the fact that the State's threats of prosecution did not dissuade the petitioner's witnesses from testifying, this Court concludes that those threats were harmless with respect to the petitioner's witnesses, and there was no violation of the Due Process Clause that ought to be redressed by habeas corpus.

C.

The petitioner contends that the prosecution withheld exculpatory evidence from the defense that suggested that another person was the perpetrator. Alternatively, the petitioner alleges that his trial attorney was ineffective for failing to discover and present this evidence at trial.

As mentioned above, at trial, Stephen Stein, Sr. testified that he saw a strange man fleeing from the direction of the murder scene only minutes after the murder. Stein had testified that it was unusual for someone to be walking on a rural road at that late hour of the evening. Stein also testified that he had seen a white pickup truck in the area at the time of the murder. Mark Andrew Haveman and his wife Christina also testified that they saw taillights from a car or truck by the railroad grade near the victim's farm at the time of the shooting. All of this evidence suggested that someone else may have been the actual perpetrator of this murder.

The petitioner now claims that several members of Stephen Stein, Sr.'s family also saw this stranger walking away from the crime scene at the time of the murder, and that they were harassed and intimidated up until the time of the petitioner's trial, possibly by the actual perpetrator of the murder. The petitioner contends that the police and prosecutor were aware of this evidence but withheld it from defense trial counsel.

A year after the petitioner's trial, the petitioner's appellate attorney learned that Stephen Stein, Sr.'s wife, children, and nephew had seen a stranger come out of the bushes near the murder scene on the night of the murder. In addition, Steve Stein, Jr. had seen a white pickup truck allegedly "casing" the railroad grade when Philip Timmerman was planting on the afternoon of the shooting, and observed this same truck go down the grade the night before the shooting. Deborah Stein, Stephen, Sr.'s wife, believed that this truck also returned to their home several times after the killing to frighten and intimidate them, which ultimately caused the Steins to move out of fear of retaliation. The petitioner's post-trial motion to preserve the testimony of these witnesses by deposition was granted. Soon after the witnesses were deposed, the Steins' former home burned to the ground. All of these depositions were later admitted, pursuant to a stipulation between the parties, at the petitioner's motion for a new trial.

Stephanie Stein testified that on the night of the murder, she saw an ambulance and fire truck go by her house and went to the crime scene wither her brother Steve and her cousin Ricky Stein. She remained about five minutes at the crime scene before returning home. While returning, she saw a tall, skinny man come out of some bushes near a ditch close to the railroad grade that intersected the road, stand for a minute, and walk down the road toward her father. A few minutes later, she

heard her father call for her brother and saw a pickup truck stop on the road and heard the driver of the truck question her brother. Stephanie Stein acknowledged that defense investigator Patrick Parr had been to the Stein home to interview her father, but she did not tell Parr what she had seen because she did not want to get involved and she did not realize that this might be connected to Philip Timmerman's murder. Stephanie was interviewed by Detective O'Reilly, but only about Parr's interview with her father and not what she had actually observed. Stephanie Stein also stated that her family began to be harassed shortly after the murder by late night phone calls and visits by a white pickup truck with a noisy muffler. Stephanie testified that this harassment stopped immediately after the trial, but began about ten days before her deposition was taken.

Steve Stein, Jr. testified that around sunset on the night of the murder, he saw a white pickup truck with "glass pack" mufflers driven by a man who was not the petitioner go by their house very slowly and then up the railroad grade toward the murder scene. Later than night, he ran toward the scene with his sister and cousin. On the way home, a pickup truck stopped, and the driver asked Steve Stein, Jr. what had happened. The driver also spoke with Stein's mother. However, Steve Stein, Jr. was not sure if this pickup truck was the same one that he had seen on the railroad grade, although both were white Fords. Steve further believed, although he was not positive, that the white truck that stopped him on the road was the same one that returned when his family was harassed after the murder and until the trial was over. In addition to the late night visits by this truck, Steve stated that his family received numerous hangup phone calls, and there was also an incident in which the Steins's trash container was taken to the murder scene and left where Timmerman had been shot. The harassment started up again before the depositions took place. Steve Stein, Jr. indicated that he was subpoenaed by the prosecutor but was not called at trial. Steve was not home when Detective O'Reilly came to speak to his family, so no statement was ever taken from him. Steve, Jr. did make a statement to defense investigator Parr before the terrorizing had occurred, and he did not tell Parr what his sister had seen.

Ricky Stein testified that he never spoke with the police or the defense before trial. He observed a white Ford truck on the day of the murder driving slowly by his house and park on the railroad grade near the murder scene around 6:00 p.m. Later that evening, he heard gunshots and went to the scene with his cousins to find out what had happened. On the way home, Ricky Stein saw a tall, skinny man walk past his Uncle Stephen near the railroad grade.

Deborah Stein, Stephen, Sr.'s wife, testified that she heard an ambulance go by her house on May 18, 1995 as she was unloading laundry. Her children and nephew went to the crime scene. A few minutes later, she went to retrieve her children and nephew. On the way home, a white Ford pickup stopped in the middle of the road and the driver began to persistently ask her questions about what she had seen, exactly how long she was at the scene, and how many police were there. The driver also wanted to know who her children were and where they lived.

Deborah Stein and her husband spoke with defense investigator Parr several days after the murder, and she told Parr what she had seen on the night of the murder, but did not tell him about the harassment because it had not yet begun to occur. Detective O'Reilly only came to interview her family about two weeks be-

fore the petitioner's trial, but was only interested in how Parr conducted his interview. Deborah Stein testified that she and her family were reluctant to get involved in this case because of the ongoing harassment and because Detective O'Reilly assured her that the petitioner was guilty. Deborah Stein reiterated the testimony of the other Stein family members concerning the types of harassment that the family suffered from after the murder. Although not positive, Deborah Stein believed that the white truck that stopped her on the road on the night of the murder was the same one connected with the harassment, but she was more certain that the truck that was involved in the harassment of her family was the same one that she and her son had seen on the railroad grade earlier on the day of the murder. When Deborah Stein spoke with Detective O'Reilly, she informed him about the harassment, but claimed that he did not want to hear about it. According to Deborah Stein, O'Reilly suggested that the Steins get a trace on their telephone, for which she signed a consent form. Stein also testified that they called the police after several of these incidents.

Stephen Stein, Sr. was also deposed. Stein testified that he had seen both red and white pickup trucks parked near the railroad grade on the day of the murder. He also described how his family had been harassed after the murder and stated that his wife told Detective O'Reilly about these incidents, but that O'Reilly said nothing. Although Stephen, Sr. told O'Reilly about the stranger that he had seen on the night of the murder, he stated that O'Reilly did not appear interested, indicated that the petitioner was guilty, and wrote nothing down.

At the hearing on the motion for a new trial, the petitioner's trial counsel testified that he was unaware that Steve Stein, Jr. had seen a white pickup truck go down the railroad grade in the direction of the barn at 9:00 p.m., just prior to the murder, but indicated that had he known that, he would have tried harder to subpoena him for trial. Trial counsel was also unaware that Stephen Stein, Sr. had observed white and red pickup trucks sitting on the road watching Philip Timmerman farm his fields around 3:00 p.m. on the day of the murder. The attorney was unaware that any of the other Stein family members had seen this strange man come out of the bushes on the night of the murder, but would have investigated it and used it at trial had he known. Trial counsel testified that he was never informed by the police or prosecutor about Detective O'Reilly's interview with Stephen and Deborah Stein, in which they told him about being terrorized subsequent to the murder, and never received police reports about those incidents, but indicated that he would have introduced this evidence at trial had he known.

The well-established rule of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), states that suppression by the State of evidence favorable to the accused violates the Due Process Clause where the evidence is material to either guilt or punishment, irrespective of the good or bad faith of the prosecution. The *Brady* rule is violated when (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it may impeach important inculpatory evidence; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued. *See Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To establish a *Brady* violation, then, an accused person must show that the prosecution suppressed evidence, that such evidence was favorable to the accused, and that the evidence was material. *See Carter v. Bell,* 218 F.3d 581, 601 (6th

Cir.2000). A *Brady* violation is grounds for setting aside a conviction or a sentence in a habeas proceeding only if the failure to disclose the evidence "undermines confidence in the verdict because there is a reasonable possibility that there would have been a different result had the evidence been disclosed." *Coe v. Bell,* 161 F.3d 320, 344 (6th Cir.1998), *cert. denied.* Stated differently, the writ will not issue on the basis of an alleged *Brady* violation unless the undisclosed evidence creates a reasonable probability that a different result would have occurred. *Coleman v. Mitchell,* 244 F.3d 533, 541 (6th Cir.2001), *cert. denied,* 535 U.S. 1031, 122 S.Ct. 1639, 152 L.Ed.2d 647 (2002) (quoting *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936).

In this case, the petitioner's representatives had access to the Stein family members; they were not concealed or "suppressed" by the State. Defense counsel sent one of his investigators to interview them. There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source. *Coe,* 161 F.3d at 344. The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him or her to take advantage of exculpatory evidence. *Coleman v. Mitchell,* 268 F.3d 417, 438 (6th Cir.2001).

Moreover, the suppression of evidence that is cumulative of other evidence that the jury considered will generally not undermine confidence in the verdict. *See United States v. Bencs,* 28 F.3d 555, 560–561 (6th Cir.1994), *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). Here, evidence that a suspicious person was seen fleeing the crime scene at the time of the murder was presented at the petitioner's trial through the testimony of Stephen Stein, Sr. If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant is prejudiced by its nondisclosure. *United States v. Word,* 806 F.2d 658, 665 (6th Cir.1986). In the present case, the jury was told that Stephen Stein, Sr. had observed a suspicious individual fleeing the crime scene at the time of the murder. In addition, the Havemans testified that they had observed a vehicle parked by the railroad grade at the time of the killing. Because this information was presented to the jury, there was no *Brady* violation. *See Norris v. Schotten,* 146 F.3d 314, 334 (6th Cir.1998). Since testimony from the other Stein family members concerning their encounter with a strange man near the crime scene would have been cumulative of Stephen Stein Sr.'s testimony, no *Brady* violation occurred. *See Spence v. Johnson,* 80 F.3d 989, 995 (5th Cir.1996). Therefore, the petitioner is not entitled to habeas relief on his *Brady* claim.

The petitioner's ineffective assistance of counsel claim based on the failure to present this evidence also fails for a similar reason. As previously noted, the petitioner must establish that his attorney's constitutionally deficient performance caused his prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Since the evidence that went "undiscovered" by the petitioner's trial counsel was cumulative, any failure attributable to defense counsel to discover and produce it did not run afoul of the Sixth Amendment as interpreted by *Strickland.*

D.

The petitioner next claims that he is entitled to habeas relief because his convictions result from evidence obtained during the course of a search and seizure that violated the Fourth Amendment. The petitioner contends that the affidavit that was used to procure the warrant to search his house contained material misstatements, and that the evidence seized there-

by should have been suppressed. Federal courts will not address a Fourth Amendment claim in a habeas proceeding if the petitioner had a full and fair opportunity to litigate the claim in state court and the presentation of the claim was not thwarted by any failure of the state's corrective processes. *Stone v. Powell,* 428 U.S. 465, 494–95, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The court performs two distinct inquiries when determining whether a petitioner may raise a claim of illegal search and seizure in a habeas action. First, the "court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Machacek v. Hofbauer,* 213 F.3d 947, 952 (6th Cir.2000) (quoting *Riley v. Gray,* 674 F.2d 522 (6th Cir.1982)).

The petitioner here does not allege that the state court failed to hold a hearing on his Fourth Amendment claim. In fact, an evidentiary hearing was held on this very issue. Rather, the petitioner contends that he was denied a full and fair opportunity to litigate his Fourth Amendment claim because the state courts failed to make the correct factual determination when they ruled that the affidavit contained sufficient information to allow the magistrate to find probable cause to issue the search warrant.

There is no merit to this argument. Although a federal habeas court may inquire into the adequacy and fairness of the available state court procedures that were used to adjudicate a habeas petitioner's Fourth Amendment claim, "its inquiry ordinarily ends upon a determination that those procedures pass muster." *Sanna v. Dipaolo,* 265 F.3d 1, 8–9 (1st Cir.2001). As long as a state prisoner has had an opportunity to litigate his Fourth Amendment claims by means of procedures that are "suitably crafted" to test for possible Fourth Amendment violations, a federal habeas court does not have the power, under *Stone,* to "second-guess the accuracy of the state courts' resolution of those claims." *Id.* Thus, a "mistaken outcome" of a suppression hearing that has been conducted in a state trial court, standing alone, does not deny a habeas petitioner's opportunity to fully and fairly litigate his Fourth Amendment claims. *Id.* at 9. The relevant inquiry is whether a habeas petitioner had an opportunity to litigate his claims, not whether he in fact did so or even whether the Fourth Amendment claim was correctly decided. *Ortiz–Sandoval v. Gomez,* 81 F.3d 891, 899 (9th Cir.1996). Thus, even "potentially meritorious Fourth Amendment claims" are barred by *Stone* on habeas review if the petitioner had a full and fair opportunity to litigate his claims in the state courts. *Deputy v. Taylor,* 19 F.3d 1485, 1491 (3d Cir.1994), *cert. denied,* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994).

## E.

Finally, the petitioner contends that the trial court failed to provide a proper instruction defining the concept of reasonable doubt. The trial court gave the standard Michigan jury instruction on reasonable doubt, which states:

> A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not an imaginary or possible doubt but a doubt based on reason and common sense. A reasonable doubt is just that. A doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case.

Mich. Cr. Jury Inst.2d § 3.2.

This Court previously has criticized Michigan's standard instruction on the

subject because it "conveys very little information to jurors as to the constituencies of reasonable doubt, which is the key component of the state's burden of proof. Rather, it directs the jury to the nature of the evidence, tells them to use their common sense, and then, in a grand display of circularity, 'explains' that a 'reasonable doubt' is' "[a] doubt that is reasonable.'" *Poremba v. Bock,* No. 99–10450–BC, 2003 WL 102632, at *12 (E.D.Mich.2003). However, the Sixth Circuit has held that this instruction does not violate the Due Process Clause, as the petitioner has acknowledged. *See Binder v. Stegall,* 198 F.3d 177 (6th Cir.1999).

The petitioner attempts to distinguish *Binder* by contending in this case that the prosecutor "denigrated" the reasonable doubt standard by stating in his closing argument that a "reasonable doubt is something this [sic] is very nebulous that you have to decide what a reasonable doubt it [sic], the Judge will instruct you on it." Trial Tr. XII at 166. The Michigan Court of Appeals rejected this claim, finding that the trial court's instruction on reasonable doubt was proper and that the petitioner had failed to request a modified instruction on reasonable doubt, thus precluding relief on this claim. *People v. Wynne,* 1999 WL 33328893, at * 5.

The Court finds that the petitioner's jury instruction claim was denied by the state appellate court because he did not follow the correct procedure to preserve the claim. The doctrine of procedural default provides:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection, or file a motion for a directed verdict. *United States v. Frady,* 456 U.S. 152, 167–69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Simpson v. Sparkman,* 94 F.3d 199, 202 (6th Cir.1996).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir.2001), *cert. denied* 536 U.S. 947, 122 S.Ct. 2635, 153 L.Ed.2d 816 (2002); *Warner v. United States,* 975 F.2d 1207, 1213–14 (6th Cir.1992), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1314, 122 L.Ed.2d 702 (1993). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar." *Simpson,* 94 F.3d at 202. Whether the independent state ground is adequate to support the judgment is itself a federal

question. *Lee v. Kemna,* 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002).

Here, the state court of appeals relied on a state statute that required the petitioner to request a jury instruction in the trial court in order to assign instructional error on appeal. *See* Mich. Comp. L. § 768.29. The statute plainly states that "[t]he failure of the court to instruct on any point of law shall not be ground for setting aside the verdict of the jury unless such instruction is requested by the accused." The Court finds that the state court of appeals' reliance on this procedural default constitutes an adequate and independent state ground to deny relief. Since the petitioner demonstrated neither cause nor prejudice, habeas relief on this ground will be denied.

III.

Because the Court finds the petitioner's trial was unfair due to the violations of the Sixth Amendment and the Due Process Clause explained earlier, the Court concludes that the petitioner is in state custody in violation of the United States Constitution as a result of a state court decision "that ... involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **GRANTED.**

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within ninety days.